[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/09/99
THOMAS K. KAHN
CLERK

No. 98-2403

D.C. Docket No. 3:96cv381/LAC

GULF POWER COMPANY, ALABAMA
POWER COMPANY, an Alabama corporation,
et al.,

Plaintiffs - Appellants,
Cross-Appellees,

versus

UNITED STATES OF AMERICA,
FEDERAL COMMUNICATIONS COMMISSION,

Defendants - Appellees,
Cross-Appellants.

Appeals from the United States District Court
for the Northern District of Florida

**(September 9, 1999)**

Before EDMONDSON and CARNES, Circuit Judges, and WATSON[*], Senior Judge.

_____
[*]Honorable James L. Watson, Senior Judge, U.S. Court of International Trade, sitting by designation.

CARNES, Circuit Judge:

The plaintiffs–Gulf Power Co., Alabama Power Co., Georgia Power Co., Mississippi Power Co., Ohio Edison Co., Duke Power Co., and Florida Power Corp.–are electric utility companies who brought suit against the United States and the Federal Communications Commission seeking a declaration that the 1996 amendment to the Pole Attachment Act, as codified at 47 U.S.C. § 224(f), is facially unconstitutional because it effects a taking of their property without an adequate process for securing just compensation, in violation of the Fifth Amendment. The district court agreed that the amendment effected a taking of property, but granted summary judgment in favor of the defendants after concluding the amendment did not deny the utilities an adequate process for securing just compensation. For the reasons set forth below, we affirm the district court's judgment.

## I. BACKGROUND

The plaintiffs, like other electrical utilities in this country, own vast networks of poles, ducts, conduits, and rights-of-way which are used to supply electricity to consumers. Power lines are strung across public and private lands and millions of poles support those lines.[1] Ducts and conduits–usually

[1]For example, plaintiff Duke Power owns 1.8 million distribution poles located on 74,134 miles of public and private rights-of-way.

underground pipes encased in concrete–house electric conductors.  Although the utilities were able to negotiate privately with some land-owners to secure rights-of-way, they also received substantial assistance from state governments in acquiring their networks.  States routinely delegated to utilities their sovereign power of eminent domain so that they could acquire the needed rights-of-way.  In addition, states allowed utilities to locate their network facilities, e.g., poles, on public rights-of-way.

As with electric utilities, cable television companies must have a physical carrier for their cables in order to supply television signals to their customers.  Because "underground installation of the necessary cables is impossible or impracticable[,] [u]tility company poles provide . . . virtually the only practical physical medium for the installation of television cables." FCC v. Florida Power Corp., 480 U.S. 245, 247, 107 S. Ct. 1107, 1109 (1987).  With the advent of cable television in the 1950's, it became common practice for cable companies to lease access to utility companies' poles.

Over time, however, cable companies grew upset with the access rates and complained to Congress that utilities "were exploiting their monopoly position by engaging in widespread overcharging." Id. at 247, 107 S. Ct. 1109-10.  Congress responded in 1978 by enacting the Pole Attachments Act, which was codified at 47 U.S.C. § 224.  In that act, Congress empowered the Federal Communications

3

Commission ("FCC"), in those states in which access rates were not already regulated, to determine "just and reasonable" rates a utility could charge cable companies for access to its poles, ducts, conduits, and rights-of-way. See 47 U.S.C. § 224(b). Congress restricted the FCC, however, to setting a rate within a statutorily defined range of minimum to maximum rates. See 47 U.S.C. § 224(d)(1).[2] Significantly, the Pole Attachments Act, as originally enacted in 1978, did not require a utility to provide cable companies access to its property. Instead, it provided that if a utility voluntarily chose to provide access, the rate charged for that access was subject to FCC regulation.

Things stayed that way until 1996, when telecommunication carriers joined cable companies in demanding a right of access to utilities' networks of poles, ducts, conduits, and rights-of-way. Telecommunication carriers were interested in using wire communications to carry their signals and, like cable companies, needed

---

[2]Section 224(d)(1) provides: "[a] rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way." 47 U.S.C. § 224(d)(1). As the Supreme Court has explained, "[t]he minimum measure is thus equivalent to the marginal cost of attachments, while the statutory maximum measure is determined by the fully allocated cost of the construction and operation of the pole to which the cable is attached." FCC v. Florida Power Corp. 480 U.S. at 253, 107 S. Ct. at 1113.

a physical carrier for their wires. Congress responded to these demands by amending the Pole Attachments Act as part of the Telecommunications Act of 1996. For the purposes of this case, the most significant amendment is a mandatory access provision which provides that a "utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." 47 U.S.C. § 224(f)(1). The only exceptions to a utility's mandatory obligation to provide access are where there is insufficient capacity or some safety, reliability, or other engineering problem. See 47 U.S.C. § 224(f)(2).

Although Congress amended the Pole Attachments Act to require utilities to provide access to their property, it left intact the FCC's authority to determine the compensation a utility is entitled to receive for providing that access. Hence, as before, the FCC determines the compensation a utility may receive for providing access by setting a "just and reasonable" rate within the range of minimum to maximum rates Congress set forth in the Act[3]; 47 U.S.C. § 224(d) describes the range of rates for cable companies' access, while 47 U.S.C. § 224(e) describes the range of rates for telecommunication carriers' access.

---

[3]For convenience, we will hereinafter use the term "Act" to refer to the Pole Attachments Act as amended in 1996.

The FCC's rate order, however, is not final.  If a utility believes the rate set by the FCC fails to provide adequate compensation, it may seek relief by appealing directly to a United States Court of Appeals.  See 47 U.S.C. § 402(a).  Among other things, the court of appeals is empowered to enter "a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part" the FCC's order.  28 U.S.C. § 2349(a).

As mentioned earlier, the plaintiffs are seven electric utility companies. Each falls within the Act's definition of a "utility"[4] and is therefore required to provide cable companies and telecommunication carriers access to its poles, ducts, conduits, and rights-of-way under the Act's mandatory access provision.  See 47 U.S.C. § 224(f).  The plaintiffs brought this suit in federal district court against the United States and the FCC (the "defendants") seeking a declaration that the Act's mandatory access provision is facially unconstitutional because it constitutes a taking of property without an adequate process for securing just compensation, as required by the Fifth Amendment.  They also sought to permanently enjoin and restrain the defendants from enforcing the mandatory access provision.

---

[4]The Act defines "utility" as "any person who is . . . an electric . . . public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used in whole or in part, for any wire communications." 47 U.S.C. § 224(a).

After the plaintiffs filed suit, the Association for Legal Telecommunication Services, which is a non-profit, national trade association representing telecommunications companies, and American Communication Services, which is a telecommunications service provider, intervened as party defendants. In addition, several national and state cable television associations participated as amici curiae supporting the defendants.

The plaintiffs, defendants, and intervenors all moved for summary judgment. The district court agreed with the plaintiffs that the Act's mandatory access provision effected a taking of property under the Fifth Amendment. However, it concluded the plaintiffs' facial challenge failed because the Act provided an adequate process for securing just compensation for that taking. Accordingly, the district court denied the plaintiffs' motion for summary judgment but granted the defendants' and intervenors' motions for summary judgment. The plaintiffs appealed, contending that the district court erred in not finding that the Act's mandatory access provision was unconstitutional. The defendants cross-appealed the court's determination that the Act's mandatory access provision effected a taking of property.

## II. DISCUSSION

The plaintiffs' contention that the Act's mandatory access provision is facially unconstitutional requires us to address the following two issues. First,

does the Act's mandatory access provision effect a taking of property?  Second, if it does, is an adequate process available to a utility to secure just compensation for that taking?  We address each issue in turn, applying a de novo standard of review. See, e.g., Rodriguez ex. rel. Rodriguez v. United States, 169 F.3d 1342, 1346 (11th Cir. 1999) (de novo standard applies to determination of a statute's constitutionality).  In addition, we note that because the plaintiffs are bringing a facial challenge to the Act, they must "establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) (emphasis added).  See also New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 11, 108 S. Ct. 2225, 2233 (1988) ("to prevail on a facial attack the plaintiff must demonstrate that the challenged law . . . could never be applied in a valid manner.") (quotation and citation omitted); Jacobs v. The Florida Bar, 50 F.3d 901, 906 n.20 (11th Cir. 1995) ("[w]hen a plaintiff attacks a law facially, the plaintiff bears the burden of proving that the law could never be constitutionally applied.")

A. THE ACT'S MANDATORY ACCESS PROVISION EFFECTS A TAKING
OF PROPERTY

In Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S. Ct. 3164 (1982), the Supreme Court considered whether a statute which required landlords to permit permanent, physical occupation of their property by cable

8

companies constituted a taking. The Court held that it did and, in doing so, announced the following takings rule: "[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." Id. at 426, 102 S. Ct. at 3171. Among other arguments the Court rejected in announcing that rule was the argument that the statute was merely a "permissible regulation of the use of real property." Id. at 439, 102 S. Ct. at 3178. The Court held that although property is subject to broad regulatory power, a regulation becomes a taking when the government authorizes permanent physical occupation by a third party. Id. at 439-40, 102 S. Ct. at 3178-79.

We agree with the district court that Loretto dictates the conclusion that the Act's mandatory access provision, 47 U.S.C. § 224(f), effects a taking of a utility's property. Under § 224(f), a utility has no choice but to permit a cable company or telecommunication carrier to permanently occupy physical space on its poles, ducts, conduits and rights-of-way. See 47 U.S.C. § 224(f)(1) ("[a] utility shall provide a cable television system or any telecommunication carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.") (emphasis added). Such a permanent, physical occupation of property falls squarely within the Loretto rule.

Our conclusion in that regard is consistent with FCC v. Florida Power Corp., 480 U.S. 245, 107 S. Ct. 1107 (1987), in which the Supreme Court unanimously

9

reversed this circuit's holding in Florida Power Corp. v. FCC, 772 F.2d 1537 (11ᵗʰ Cir. 1985), that the pre-1996 version of this Act effected a taking of property under Loretto. In reaching that result, the Supreme Court stressed that unlike the statute in Loretto where the landlord was required to submit to permanent physical occupation, the pre-1996 version of the Act did not require a utility to give a third party access to its property. Without the "element of required acquiescence," there was no taking under Loretto. FCC v. Florida Power Corp., 480 U.S. at 252, 107 S. Ct. at 1112. The Court went on to note, however, that it was not deciding "what the application of [Loretto] would be if the FCC in a future case required utilities, over objection to enter into . . . pole attachment agreements." Id. at 251-52 n. 6, 107 S. Ct. at 1111-12 n.6. Today, that "future case" is before us: the "element of required acquiescence" lacking in the pre-1996 version the of the Act is now present in § 224(f). Because § 224(f) requires a utility to acquiesce to a permanent, physical occupation of its property, we conclude that the Act's mandatory access provision effects a per se taking of a utility's property under the Fifth Amendment.

We are unconvinced by the defendants' attempt to distinguish Loretto. In contending the mandatory access provision does not effect a taking, the defendants do not deny that § 224(f) compels a utility to submit to a permanent, physical occupation of its property. Instead, their primary contention is that there is no taking because the utilities covered by the Act, including the plaintiffs, never had

10

an absolute right to exclude permanent, physical occupation of their poles, ducts, conduits, and rights-of-way where that permanent occupation is for a public purpose authorized by the sovereign.

The defendants' argument in support of this contention that the utilities' bundle of rights never included the power to exclude, runs as follows. Utilities obtained the rights-of-way on which they constructed their poles, ducts, and conduits via the eminent domain power which states had conferred upon them.[5] Necessary to the utilities' ability to obtain property via eminent domain was that a public purpose was being served. That is so because private property may only be taken under the eminent domain power for a "public use." See, e.g., Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 245, 104 S. Ct. 2321, 2331 (1984). Because the utilities took the property with the understanding that they would have to put it to a public use, they were necessarily on notice that, in the future, the sovereign could require them to allow permanent occupation of their property by another entity also serving the public interest.[6]

---

[5]The defendants concede some of the rights-of-way were obtained without resort to eminent domain, but argue these were acquired in the shadow of eminent domain because private parties knew that utilities could resort to eminent domain if their efforts to negotiate an agreement failed. So, we should treat all the rights-of-way as though obtained through the use of eminent domain, the defendants reason.

[6]In addition, the defendants argue that the Act's provision for payment to a utility for the permanent, physical occupation of its property somehow makes that occupation less of a taking. Although the fact of payment is, of course, relevant to

11

We find that argument unpersuasive.  The Supreme Court has expressly recognized that the fact property was taken for a public use to begin with does not mean that it may be taken again for another public use without the payment of just compensation to its owner.  In <u>Western Union Telegraph Co. v. Pennsylvania R.R. Co.</u>, 195 U.S. 540, 573, 25 S. Ct. 133, 142 (1904), the Supreme Court stated: "The "right of way of a railroad is property devoted to a public use, and . . . as such is subject, to a certain extent, to state and Federal control. . . . But it has always been recognized . . . that a railroad right of way is so far private property as to be entitled to that provision of the Constitution which forbids its taking, except under the power of eminent domain and upon payment of [just] compensation."  The Court has also noted that "the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property, and neither the corpus of that property nor the use thereof constitutionally can be taken for a compulsory price which falls below the measure of just compensation." <u>United Rys. & Elec. Co. v. West</u>, 280 U.S. 234, 249, 50 S. Ct. 123, 125 (1930), <u>overruled on other grounds by</u>, <u>Federal Power Comm'n v. Hope Natural Gas Co.</u>, 320 U.S. 591, 64 S. Ct. 281 (1944).

the just compensation issue, we fail to see how it makes the taking any less a taking.  By analogy, a tort is not any less a tort because some compensation will be paid for the injury suffered.

Consistent with these principles, we conclude that the fact a utility gained its property knowing it would be subject to extensive regulation for the public use does not means its property may be taken for a public purpose without payment of just compensation, however laudable that public purpose might be. See also GTE Northwest, Inc. v. Public Utility Commission, 900 P.2d 495, 504 (Or. 1995) (en banc) ("[t]he facts that an industry is heavily regulated, and that a property owner acquired the property knowing that it is heavily regulated, do not diminish a physical invasion to something less than a taking."). The defendants' position that a property owner who initially obtained his property for public use should henceforth be on notice that the sovereign can authorize permanent occupation of his property without payment of just compensation has it backwards. A property owner is entitled to expect that the property it acquired via eminent domain, and paid just compensation for, came with the right all property has – not to be subject to government-coerced, permanent physical occupation without just compensation.

We also find unpersuasive the three arguments raised by the amici in support of the defendants' position that the mandatory access provision does not effect a taking of property. First, the amici argue the mandatory access provision should be viewed merely as part of Congress' broad power to regulate property being used for the public interest. Because a utility's rights-of-way are regularly used for serving the public, a utility may not exclude others whom Congress has determined

13

require access, amici argue. That argument fails because it ignores the Loretto rule that "[a] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." Loretto, 458 U.S. at 426, 102 S. Ct. at 3171 (emphasis added).

Next, amici point out that the Supreme Court in Duquesne Light Co. v. Barasch, 488 U.S. 299, 307, 109 S. Ct. 609, 615 (1989), recognized that a utility has a "partly public, partly private status." That status, they argue, distinguishes a utility from the purely private property owner who suffered the taking in Loretto. Because a utility has a "partly public" status, the argument goes, a utility lacks a right to exclude others whom Congress has determined must have access to serve the public. But Duquesne's discussion of utilities was not in the context of a takings case dealing with the permanent occupation of property. Nothing in Duquesne suggests a utility's property is less subject to protection against permanent, physical occupation than anyone else's property. It is not. Put differently, we do not believe that Duquesne carved out an exception to the Loretto rule for the property of utilities.

Third, amici characterize the mandatory access provision as a simple regulatory condition designed to prevent utilities from exercising monopoly control over their network of poles, ducts, conduits, and rights-of way, and which is thereby intended to promote the Telecommunications Act of 1996's general goal of

14

fostering competition in the communications market. Such a regulation is particularly necessary, they say, because the Telecommunications Act of 1996, among its other provisions, made it easier for electric utilities to enter and compete in the communications market. This argument is meritless. Characterizing the mandatory access provision as a regulatory condition, even one allegedly designed to foster competition, cannot change the fact that it effects a taking by requiring a utility to submit to a permanent, physical occupation of its property. However laudatory its motive, Congress' power to regulate utilities does not extend to taking without just compensation the right of a utility to exclude unwanted occupiers of its property.

Finally, we reject the intervenors' argument that the mandatory access provision is not a taking because electric utilities, such as the plaintiffs, could avoid the effect of the Act by refraining from using their poles, ducts, conduits, and rights-of-way for wire communications. This argument is made possible because the Act's definition of a "utility" subject to the mandatory access provision covers only electric utilities who use their poles, ducts, conduits, and rights-of-way for wire communications. See 47 U.S.C. § 224(a). We see the point, but we think this argument is foreclosed by Loretto. The protection against a permanent, physical occupation of one's property does not hinge on the choice of use for that property. See Loretto 458 U.S. at 439 n.17, 102 S. Ct. at 3178 n.17 ("A landlord's ability to

15

rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation. [This] broad 'use-dependency' argument proves too much. . . . The right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated."). Put another way, the bundle of rights that a utility has in its property includes the right to permit its use for wire communications, and exercise of that right may not be conditioned on being forced to submit to a permanent, physical occupation of its property without payment of just compensation.

In sum, we agree with the district court's holding that the mandatory access provision effects a per se taking of property under the Fifth Amendment, which leads us to the issue of whether the Act provides an adequate process for obtaining just compensation for the taking.

## B. THE ACT PROVIDES AN ADEQUATE PROCESS FOR OBTAINING JUST COMPENSATION FOR THE TAKING EFFECTED BY THE MANDATORY ACCESS PROVISION

The fact that the Act's mandatory access provision effects a taking of property does not, by itself, make it unconstitutional. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." Williamson County Regional Planning Com'n v. Hamilton Bank, 473 U.S. 172, 194, 105 S. Ct. 3108, 3120 (1985). The Supreme Court has made the requirements clear: "[A]ll that is required is that a reasonable, certain, and

16

adequate provision for obtaining compensation exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking." Id. at 194-95, 105 S. Ct. at 3120-21 (internal citation and quotations omitted).

The plaintiffs contend the Act fails to provide a constitutionally adequate process for obtaining just compensation, for two reasons. First, they argue the process is constitutionally inadequate because it violates separation of power principles by delegating to the FCC, instead of a court, the initial task of determining the compensation a utility receives. Second, they argue the Act's provision limiting the FCC to awarding a "just and reasonable" rate within the range of rates set by Congress, see 47 U.S.C. § 224(b), will prevent a utility from receiving the constitutionally required rate of just compensation. We address each argument in turn.

### 1. Whether the Act Violates Separation of Power Principles

In support of their argument that the Act's process for providing compensation violates separation of power principles, the plaintiffs rely primarily on Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S. Ct. 622 (1893). In that case, the Supreme Court had before it a statute in which Congress had imposed limits on the amount of compensation a property owner could receive

17

after Congress had authorized the taking of his property. The property owner contended that under Congress' limitations, he had not received just compensation. The Supreme Court agreed, rejecting the notion Congress could both authorize a taking and conclusively determine the level of just compensation due. The Court stated:

> By this legislation [C]ongress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through [C]ongress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The [C]onstitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

Id. at 327, 13 S. Ct. at 626. The Court went on to note that "[t]he right of the legislature . . . to apply the property of the citizen to the public use, and then to constitute itself the judge of its own case, to determine what is the 'just compensation' it ought to pay therefor, . . . cannot for a moment be admitted or

18

tolerated under our [C]onstitution." <u>Id</u>. at 327-28, 13 S. Ct. at 627 (internal quotation and citation omitted).

According to the plaintiffs, <u>Monongahela</u> requires us to hold that the Act fails to provide a utility an adequate process to obtain just compensation for the taking of its property. That is so, they argue, because under the Act, the FCC has the initial task of determining the compensation a utility receives for the taking of its property by setting a "just and reasonable" rate within the range of minimum to maximum rates established by Congress. The plaintiffs assert that such a legislative delegation of power to the FCC usurps their right, as recognized in <u>Monongahela</u>, to a judicial ascertainment of just compensation.

The plaintiffs also seek to support their position by citing our opinion in <u>Florida Power Corp. v. FCC</u>, 772 F.2d 1537 (11th Cir. 1985), a decision which was reversed by the Supreme Court, <u>see</u>, <u>FCC v. Florida Power Corp.</u>, 480 U.S. 245, 107 S. Ct. 1107 (1987). As mentioned earlier, we held in <u>Florida Power</u> that an FCC rate order issued pursuant to the pre-1996 version of the Act constituted a taking under <u>Loretto</u>. That holding led us to also address whether the utility had received just compensation for that taking. The pre-1996 version of the Act was identical to the current Act insofar as it assigned to the FCC the initial task of setting the compensation a utility received for providing access to its property.

19

We said in <u>Florida Power</u> that this process was unconstitutional under <u>Monongahela</u> because it "does not allow for a judicial determination of what constitutes just compensation." <u>Id.</u> 772 F.2d at 1546.  It was our view at the time that Congress had prescribed in the Act "a 'binding rule' in regard to the ascertainment of just compensation" and therefore had "usurped what has long been held an exclusive judicial function." <u>Id</u>.  The plaintiffs concede that in light of the Supreme Court's reversal of our <u>Florida Power</u> decision, our statements concerning the adequacy of the process for obtaining just compensation are not binding under the prior panel precedent rule.[7]  Nonetheless, they argue our reasoning in that prior decision supports their position that the Act's process for providing just compensation is constitutionally inadequate.

Although the concerns raised by the plaintiffs and discussed in our opinion in <u>Florida Power</u> merit consideration, we are unpersuaded that the Act's process

_____

[7]The plaintiffs are correct to concede that our <u>Florida Power</u> decision is not binding.  For any part of a decision to be binding under the prior panel precedent rule, the decision must not have been vacated or reversed by the Supreme Court--it must have survived the possibility of Supreme Court review.  Our statements about the constitutional adequacy of the process for obtaining just compensation do not meet that test, because the Supreme Court had no occasion to address the issue in light of its holding that the pre-1996 version of § 224 did not result in a taking of a utility's property. <u>See</u> <u>FCC v. Florida Power Corp.</u>, 480 U.S. at 254 n.8, 117 S. Ct. at 1113 n.8 ( "Our disposition of the takings question makes it unnecessary to review on the merits the Court of Appeals' holding that Congress may not establish standards under which the initial determination of compensation will be made by an administrative authority subject to final judicial review.").

20

for providing a utility with compensation amounts to an impermissible invasion of the judicial branch's realm. True, it is ultimately the responsibility of the judicial branch to ensure that the compensation awarded for a taking satisfies the constitutional standard of just compensation. See Monongahela, 148 U.S. at 327, 13 S. Ct. at 626. Thus, if Congress (or the executive branch) attempts to impose a limitation on the measure of compensation for a taking, a court must evaluate that standard to see if it is consistent with the constitutionally mandated level of just compensation, and a court is not bound to follow that standard in making judicial determinations of the compensation due if the standard fails to secure just compensation.

However, the fact that our constitutional scheme dictates that the judicial branch is entrusted with the ultimate responsibility for ensuring that just compensation is awarded does not mean the other branches of government must be excluded from the process of determining the proper level of just compensation. Nothing in Monongahela or any other Supreme Court precedent compels such a conclusion. To the contrary, the Supreme Court has stated that "all that is required is that a reasonable, certain, and adequate provision for obtaining compensation exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking."

21

Williamson County, 473 U.S. at 194-95, 105 S. Ct. at 3120-21 (citation and quotation omitted). While a process in which the judicial branch does not make the final determination of what constitutes just compensation may be constitutionally inadequate, we see no constitutional problem with a process that employs an administrative body, such as the FCC, to determine just compensation in the first instance. Indeed, use of an administrative body with some technical expertise over the subject matter of the property to be valued likely will aid the judiciary in arriving at a more reliable determination of the proper level of just compensation. So long as an administrative body's decision concerning the level of compensation owed for a taking remains subject to judicial review to ensure just compensation, use of an administrative body can be a valid part of "provid[ing] an adequate process for obtaining compensation." Id.

Our conclusion that an administrative body may participate in the process of determining just compensation where its decision is subject to judicial review is consistent with the Seventh Circuit's decision in Wisconsin Central Limited v. Public Service Commission of Wisconsin, 95 F.3d 1359, 1369 (7th Cir. 1996). In that case, some railroads argued that the procedures Wisconsin had provided for obtaining just compensation for a taking were constitutionally inadequate because the Wisconsin legislature had authorized an administrative body to set the level of compensation in the first instance. But the administrative determination was

22

subject to judicial review in the Wisconsin courts. The Seventh Circuit decided that: "The railroads are quite correct that a decision concerning the just compensation owed one whose property is taken is the province of judicial -- not legislative -- determination. However, as <u>Williamson County</u> illustrates, this requirement is satisfied by the availability of judicial review. The Fifth Amendment does not require a judicial determination of just compensation in the first instance on each occasion of a taking of private property." <u>Id.</u> at 1369.

Accordingly, we conclude that the fact that the Act assigns to the FCC, an administrative body with some special expertise in the technical aspects of pole attachments, the task of initially determining a utility's compensation does not, by itself, render the process for providing compensation constitutionally inadequate. The more relevant issue is whether the judicial review of the FCC's determination that is available ensures that the final and conclusive determination of the just compensation owed to a utility is made by the judicial branch. We turn now to that issue.

A utility that believes the rate ordered by the FCC fails to provide just compensation for the taking of its property may appeal the FCC's rate order directly to a federal appeals court. <u>See</u> 47 U.S.C. § 402(a) (providing generally for appeals from FCC orders). The appeals court has jurisdiction to enter a judgment concerning the validity of the FCC's order and may enforce its judgment with an

injunction. See 28 U.S.C. § 2342(1) ("The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by [47 U.S.C. § 402(a)]"; 28 U.S.C. § 2349(a) ("The court of appeals . . . has exclusive jurisdiction to make and enter . . . a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency."). In addition, 5 U.S.C. § 706(2)(B) provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . .

(emphasis added). The issue of whether the rate ordered by the FCC provides a utility just compensation for a taking effected by the Act is, of course, a constitutional issue. Thus, the federal appeals court to which an appeal is taken has jurisdiction to decide that an FCC rate order is constitutionally invalid because it does not provide just compensation. Under the statutory scheme, it is the judicial

24

branch which will, consistent with <u>Monongahela</u>, make the ultimate determination of just compensation due for a taking of a utility's property under the Act.

To be sure, an appellate court is not the usual forum in which factual issues such as the proper level of just compensation are resolved, and is not the forum we would have chosen. But Congress has the right to specify the process so long as it is adequate for a judicial determination of just compensation. An appellate court has at least five means at its disposal to gather the information needed to determine just compensation, and those means are sufficient to provide a utility with a full and fair opportunity to submit for judicial consideration all relevant evidence bearing on the question of just compensation. The five means are as follows:

1) The court may rely on the evidentiary submissions in the record from the FCC proceeding when they are sufficient for the task.

2) If the court determines the record from the FCC proceeding is insufficient, it may remand the case and direct the FCC to supplement the record. <u>See</u> 28 U.S.C. § 2347(c) (the court of appeals may "order . . . additional evidence . . . to be taken by the agency" where requested to do so by one of the parties).

3.  The court may transfer the case to the district court for a full hearing pursuant to 28 U.S.C. § 2347(b)(3).[8]

4.  The court may appoint a special master pursuant to F.R.A.P. 48 to hold hearings and gather any additional information the court needs to decide the just compensation issue.

5.  The court may fashion any other "appropriate modes of procedure" to gather the evidence it needs to conduct its factual inquiry pursuant to its authority under the All Writs Act, 28 U.S.C § 1651. See Harris v. Nelson, 394 U.S. 286, 299, 89 S. Ct. 1082, 1090-91 (1969) (recognizing that courts may rely on their authority under the All Writs Act "in issuing orders appropriate to assist them in conducting factual inquiries.").

Depending on the particular facts of a case, one or some combination of those five means will provide the appellate court with a sufficient basis to determine the proper level of just compensation owed to a utility.  That part of the process is adequate.

_____

[8]We note that the option of transferring the case to the district court for a hearing is available only when the FCC has not conducted a formal hearing prior to issuing its rate order. See 28 U.S.C. § 2347(b)(3).  Of course, if the FCC has conducted a hearing, we would expect the record available to the appellate court to be more complete and hence there would be less need for transferring the case to the district court for a hearing.  Any incompleteness in the FCC hearing record could also be rectified by a remand to the FCC.

Once the appellate court has made a determination of the proper level of just compensation owed, it is positioned to resolve a utility's appeal of the FCC rate order and ensure that the utility does not suffer a taking without just compensation. If the court, based on its determination of the proper level of just compensation, concludes the rate awarded by the FCC provides just compensation, then it will simply affirm the FCC's rate order. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1013, 104 S. Ct. 2862, 2878 (1984) (where statutory arbitration procedure for providing compensation for a taking of property results in payment of just compensation, property owner has no claim against the government for a taking without just compensation).

On the other hand, if the court determines the FCC rate fails to provide just compensation and the rate which would do so falls within the range of rates specified in 47 U.S.C. § 224(d)-(e) which the FCC is authorized to award, then the court will set aside the FCC rate order and order (or as the relevant statutory provision says, "enjoin") the FCC to enter a new rate order designed to provide that the utility receives just compensation calculated from the date the cable company or telecommunication carrier first obtained access under the Act's mandatory access provision. See 28 U.S.C. § 2349(a) ("The court of appeals . . . has exclusive jurisdiction to make and enter . . . a judgment determining the validity of, and enjoining, setting aside, or suspending, . . the [FCC's] order . . . .")

Directing the FCC to issue a rate order providing that a utility receive the just compensation rate from the date it was first required to provide access under the mandatory access provision will ensure a utility receives just compensation both prospectively and in the period prior to the court's determination of the just compensation rate.  Cf.  Multimedia Cablevision, Inc. v. Southwestern Bell Tel. Co., 11 FCC Rcd. 11202, 11216 (1996) (in the event "the recomputed rates are in excess of that paid by [the attacher], we require [the attacher] to pay the difference, with interest, to [the utility].").   Such an order ensures that a utility is not forced to continue to provide mandatory access to its property unless it receives just compensation, as determined by a court, for the taking.   See Williamson County, 473 U.S. at 194, 105 S. Ct. at 3120 ("[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.")

Nonetheless, the plaintiffs contend that even if the court can guarantee the award of just compensation in some cases, there might be cases in which it could not do so.  Specifically, they raise the possibility that the just compensation rate might exceed the statutory maximum rate, as defined in 47 U.S.C. § 224(d)-(e), which the FCC is authorized to award.  Were that to occur, they assert that the court could not order the FCC to award a rate above the maximum rate specified in the Act and that a utility would therefore not receive the just compensation rate.

Accordingly, they argue that because the process fails to ensure that a utility receives just compensation in those situations, the Act is unconstitutional.

That argument does not fit in this lawsuit, because this is a facial challenge. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) (emphasis added). See also New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 11, 108 S. Ct. 2225, 2233 (1988) ("[t]o prevail on a facial attack the plaintiff must demonstrate that the challenged law . . . could never be applied in a valid manner."); Jacobs v. The Florida Bar, 50 F.3d 901, 906 n.20 (11th Cir. 1995) ("[w]hen a plaintiff attacks a law facially, the plaintiff bears the burden of proving that the law could never be constitutionally applied.")

The plaintiffs have not carried that burden in this case. As we have already discussed, there are a readily identifiable set of circumstances in which the Act provides a constitutionally adequate process for ensuring a utility receives just compensation. Specifically, where the court determines that the rate awarded by the FCC provides just compensation, the court can affirm the FCC rate order. Conversely, if the FCC rate does not provide just compensation, the court can direct the FCC to enter a new order providing the just compensation rate, at least in

29

those circumstances where the just compensation rate falls within the statutory range specified in 47 U.S.C. § 224(d)-(e).

Even if the plaintiffs are correct in stating that the court could not direct the FCC to award a rate exceeding the statutory maximum -- an issue we need not decide here -- the plaintiffs have identified, at most, one hypothetical set of circumstances in which the Act would not provide an adequate process to ensure a utility receives just compensation. But conjuring up one hypothetical set of circumstances in which the Act could operate in an unconstitutional manner does not suffice to establish that the Act is facially unconstitutional.[9]

In sum, we reject the plaintiffs' contention that the Act fails to provide an adequate process for a utility to obtain just compensation because it violates

---

[9]We use the word "hypothetical" because the plaintiffs have not pointed to any evidence demonstrating that the just compensation rate will ever exceed the statutory maximum rate. Their failure to do so is significant for another reason as well. Three Supreme Court Justices have recently questioned Salerno's "no set of circumstances" formulation of the facial challenge standard and suggested that a plaintiff can prevail on a facial challenge by merely showing the Act is unconstitutional in most cases. See City of Chicago v. Morales, – U.S. –, –, 119 S. Ct. 1849, 1858-59 n.22 (1999) (plurality op.) (Stevens, J., Souter, J., and Ginsburg, J.); Janklow v. Planned Parenthood, 517 U.S. 1174, 1175 & n.1, 116 S. Ct. 1582, 1583 & n.1 (1996) (Memorandum respecting the denial of certiorari.) (Stevens, J.). See also Florida League of Professional Lobbyists, Inc. v. Meggs, 87 F.3d 457, 459 (11th Cir. 1996) (recognizing disagreement among the Justices concerning "how high the threshold for facial invalidation should be set."). Because the plaintiffs have not shown the just compensation rate will ever fall outside the statutory range, let alone that it will do so in most cases, their facial challenge fails even under the more permissive formulation suggested by Justices Stevens, Souter, and Ginsburg.

separation of power principles. Had the Act eliminated all possibility of judicial review and made the FCC the final arbiter of a utility's compensation, we would be faced with a different situation, but the Act does not do that. Instead, as we have explained, the Act merely provides that the FCC has the first cut at fashioning the compensation a utility receives for the taking of its property. Allowing an administrative body, such as the FCC, a role in the process of determining just compensation for a taking is permissible so long as its order is subject to judicial review to ensure that a court makes the ultimate determination of just compensation. That is what we have here: the FCC's rate order is subject to review by an appellate court which has the power both to determine the proper level of just compensation and to ensure that the utility receives just compensation, at least where the just compensation rate falls within the statutory range of rates specified in 47 U.S.C. § 224(d)-(e).

2. Whether Limiting the FCC to Awarding a "Just and Reasonable" Rate Makes the Act's Process for Awarding Just Compensation Constitutionally Inadequate

We turn now to the plaintiffs' alternative argument in support of their position that the Act fails to provide a constitutionally adequate process for a utility to obtain just compensation. They argue the Act's provision limiting the FCC to awarding a "just and reasonable" rate within the range of rates set by Congress, see 47 U.S.C. § 224(b), will prevent the FCC from awarding a utility the

constitutionally required rate of just compensation. The plaintiffs begin by noting that the Act's "just and reasonable" rate formula is the same formula the FCC was required to apply in calculating compensation for access to a utility's property before the mandatory access provision was added to the Act. Hence, a utility's rate of compensation for forced access to its property (a taking) is governed by the same standard as when it voluntarily provided access. The plaintiffs say that fact renders the process for awarding just compensation for the taking constitutionally inadequate.

According to the plaintiffs, because a utility's property is now being taken, the rate it was able to collect when it was voluntarily providing access is no longer appropriate. That is so, they argue, because the standard for determining just compensation for a taking should be more rigorous than that for determining a rate for providing voluntary access. Citing <u>Duquesne Light Co. v. Barasch</u>, 488 U.S. 299, 307, 109 S. Ct. 609, 615 (1989), the plaintiffs point out that the rate a utility is entitled to receive for providing access voluntarily must only be "not so unjust as to be confiscatory." In contrast, they say, the Supreme Court has defined "just compensation" more expansively. (citation and quotation omitted). For example, in <u>United States v. Miller</u>, 317 U.S. 369, 374, 63 S. Ct. 276, 280 (1943), the Court defined just compensation as "fair market value," which is "what it fairly may be believed that a purchaser in fair market conditions would have given." (citation and

quotation omitted).  Thus, the plaintiffs contend, by providing that a utility receive the same rate for forced access as it received for voluntary access, the Act fails to provide an adequate process for a utility to obtain just compensation.  Cf. Consolidated Gas Co. v. City Gas Co., 912 F.2d 1262, 1314-19 (11th Cir. 1990) (en banc) (Tjoflat, C.J., dissenting) (endorsing the proposition that the "just compensation price" a utility receives for a taking should satisfy a "more stringent standard" than the standard that applies in setting rates, because in one instance the utility is acting under compulsion while in the other instance it has "voluntarily undertaken to operate in a regulated industry"), vacated, City Gas Co. v. Consolidated Gas Co., 499 U.S. 915, 111 S. Ct. 1300 (1991).

As an initial matter, we do not believe this issue is ripe for decision.  Shorn of its packaging about the regulatory price versus the just compensation price, the issue comes down to whether the Act is unconstitutional because it says the FCC shall order a "just and reasonable" rate instead of saying it shall order a rate that provides "just compensation."  At this point, however, we are merely dealing with abstractions and not with concrete facts; it would require sheer speculation for us to conclude that the actual rates ordered by the FCC will fail to provide just compensation.  Even the plaintiffs seem to concede this point when they note in their reply brief that they are not challenging the Act's "formula" for providing compensation.  In light of the speculative nature of the inquiry, this issue is not

33

"fit[] . . . for judicial decision" at this juncture. Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515 (1967) ("basic rationale" of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements").

We do not mean to imply that if this issue were ripe for decision we would be persuaded by plaintiffs' argument. The Duquesne decision they rely upon was not interpreting any aspect of this Act, either before or after its 1996 amendment. Instead, that decision merely held that in a regulated industry the level of compensation set by the government must not be so low as to be confiscatory. See Duquesne, 488 U.S. at 307, 109 S. Ct. at 615. There is nothing in Duquesne, or in the record before us, which indicates that the rate of compensation  provided in this Act ( before its amendment)  for voluntarily provided access was just above confiscation. We have no reason to assume that the rate under the prior version of the Act was only minimally adequate to meet constitutional requirements for voluntary access, and thus, in the plaintiffs' view, constitutionally inadequate under the current Act for forced access situations. Indeed, for all we know, it is just as likely that the earlier rate formula gave the utilities industry more than the constitutional minimum.

In any event, as we have explained, the FCC's determination of the compensation a utility receives is not conclusive under the Act. A utility that

34

believes the FCC's rate order fails to provide just compensation may appeal that order to the court of appeals. The court will then make a judicial determination of the proper level of just compensation and ensure that the utility is not required to provide access to its property at a rate that does not provide just compensation.[10] That said, we decide nothing about the relationship between the "just and reasonable" rate specified in the Act and just compensation required by the Constitution, because that issue is not ripe for decision.

## III. CONCLUSION

To sum up, we conclude the Act's mandatory access provision effects a taking of a utility's property but that the Act is not facially unconstitutional under the Fifth Amendment, because, at least in most cases, it provides a constitutionally adequate process which ensures a utility does not suffer that taking without obtaining just compensation. Accordingly, the district court's judgment in favor of the defendants is AFFIRMED.

---

[10]As with our discussion of the first argument, we are assuming here that the just compensation rate falls within the statutory range specified in 47 U.S.C. § 224(d)-(e) and, in the absence of any evidence that the just compensation rate will ever fall outside that range, we leave for another day the issue of what happens if it does.