CARNES, Circuit Judge,
concurring in part and dissenting in part:
On review in these cases is In the Matter of Implementation of Section 703(e) of the Telecommunications Act of 1996, 13 F.C.C.R. 6777, 1998 WL 46987 (1998) (“Order ”), the order of the Federal Communications Commission which implements the amendments to the Pole Attachment Act of 1978, 47 U.S.C. § 224, contained in the Telecommunications Act of 1996. Because I believe that the Pole Attachment Act of 1978, as amended, extends regulated rates to all pole attachments, including those used for wireless telecommunications service and Internet service, I dissent from the parts of the Court’s decision reaching a contrary conclusion. .
I do agree with the majority opinion’s conclusions regarding the petitioners’ facial attack on the rate formula, prescribed in the Order. As this Court held in Gulf Power Co. et al. v. United States, 187 F.3d 1324 (11th Cir.1999) (“Gulf Power I”), section 224(f), the statutory provision requiring utilities to accept pole attachments, effects a per se taking of property under the Fifth Amendment for which just compensation is required.[1] Id. at 1328-31. *1280 But the petitioners have failed to show that the Order’s, rate formula will deny just compensation in every case. Consequently, their facial challenge to the formula is unripe and, as the majority opinion concludes, it should not be considered by this Court.[2] Id.
I disagree, however, with the majority opinion’s holdings regarding wireless telecommunications service and Internet service. It concludes that the FCC has no authority to regulate either wireless telecommunications carriers or Internet service providers, but the plain language of the statute mandates the opposite conclusion.[3]
Section 224(b)(1) provides that the FCC “shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable.” The term “pole attachment” is defined in section 224(a)(4) as “any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.” (emphasis added). As this Court has stated, more than once, “the adjective ‘any’ is not ambiguous; it has a well-established meaning.” Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir.1997); accord Lyes v. City of Riviera Beach, Florida, 166 F.3d 1332, 1337 (11th Cir.1999) (en banc). “Read naturally, the word ‘any’ has an expansive meaning, that is, ‘one or some indiscriminately of whatever kind.’ ” United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) (citations omitted) (as quoted in Merritt, 120 F.3d at 1186). Applying that definition to sections 224(a)(4) and (b)(1), the FCC has the authority to regulate all attachments, i.e., attachments “of whatever kind,” id., by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility. Obviously, all attachments includes those attachments used to provide wireless and Internet services.
The majority opinion does not attempt to justify its conclusions regarding -wireless service with the language of the statute, except to say that there is a “negative implication” created by the statutory definition of a pole attachment coupled with the definition of a utility.[4] But the negative implication, if there is one at all, is not nearly as strong as the majority seems to think. The statutory definition of utility serves merely to exempt from mandatory access any utility that does not make its *1281 poles available for wire communications at all. If a utility does not make its poles available for wire communications, it does not have to make its poles available for wireless communications. However, once a utility makes its poles available, even “in part,” for wire communications, it is subject to mandatory access for all pole attachments. Nothing about the definition of utility negates the FCC’s mandate to regulate rates for all pole attachments.
Notwithstanding the straightforward statutory language, the majority opinion turns to legislative history to justify its conclusion about wireless communications. But the Supreme Court, as well as this Court, has repeatedly held when the meaning of a statute is clear from its plain language, it is unnecessary to look to legislative history. See Gonzales, 520 U.S. at 6, 117 S.Ct. at 1035 (“Given the straightforward statutory command, there is no reason to resort to legislative history.”); Ratzlaf v. United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) (“we do not resort to legislative history to cloud a statutory text that is clear”); United States v. Paradies, 98 F.3d 1266, 1288 (11th Cir.1996) (“Because the language in the statute is clear, it would be improper to look to the legislative history for clarification.”). Because the statutory language at issue is unambiguous, resort to legislative history in order to undermine it is unnecessary and improper.
With respect to Internet service, the majority opinion concludes that the FCC has no authority to regulate it because Internet service is neither a cable service nor a telecommunications service, and is thus not covered by the rate formulas described in section 224(d) for “solely” cable services and in section 224(e) for telecommunications services. But the majority opinion fails to address the section 224(b)(1) mandate that the FCC “regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable .... ” Because pole attachment is defined as “any attachment,” and because of the unambiguous definition of “any,” section 224(b)(1) requires the FCC to ensure just and reasonable rates for all pole attachments, including those used to provide Internet service.
Finally, I agree with the majority opinion’s conclusion that the FCC has the authority to regulate dark fiber and that the FCC’s decision not to treat dark fiber as a separate attaching entity is reasonable. For reasons I have already discussed, dark fiber is within the definition of pole attachment, and it is therefore within the FCC’s regulatory authority. The FCC’s decision to treat dark fiber and its host attachment as one attaching entity is reasonable, because, as the majority opinion notes, “dark fiber, by definition, is merely bare capacity and is included within its host attachment at the time that cable is attached to the pole.”
The problem is how the majority opinion reaches the conclusion that the FCC is authorized to regulate dark fiber. It does so by concluding that because dark fiber is neither a cable service nor a telecommunications service, the statute is ambiguous. But the same majority opinion also concludes that because Internet service is neither a cable service nor a telecommunications service, the statute is unambiguous and Internet service is outside the FCC’s regulatory authority. The majority cannot have it both ways — either the statute unambiguously gives the FCC the authority to regulate only cable and telecommunications services, or the statute is ambiguous about whether the FCC has authority to regulate more than cable and telecommunications services. My view is consistent: The statute unambiguously gives the FCC authority to regulate any and all pole attachments. The majority opinion’s view is not consistent.
Because I believe that the statute unambiguously gives the FCC regulatory authority over wireless telecommunications service and Internet service, I dissent *1282 from those parts of the majority opinion holding to the contrary.

. Section 224(0 reads as follows:
(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, conduit, or right-of-way owned or controlled by it.
(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-dis *1280 criminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

. Likewise, I agree with the majority opinion’s conclusion regarding the petitioners’ argument that the rate formula denies just compensation when wires are overlashed because no additional compensation is awarded. It is possible that in some cases the rate formula will provide just compensation for both the original attachment and the overlashed cables without additional compensation. Again, the petitioners have failed to show that the rate formula will deny just compensation in every case. Thus, their challenge is unripe.

. As noted in the majority opinion, we apply the two-step Chevron analysis to agency interpretations of a statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, the court is to determine if the intent of Congress is clear; if so, that is the end of the matter. On the other hand, if Congress has not spoken directly to the precise question at issue, a second step of review comes into play, and the court must determine whether the agency’s answer to the question Congress left open reflects a permissible construction of the statute.” Jaramillo v. INS, 1 F.3d 1149, 1152 (11th Cir.1993) (en banc). We use the normal tools of statutory construction to judge whether Congress’ intent is clear. See INS v. Cardoza Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (quoting Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9).

.Pole attachment is defined in section 224(a)(4) as "any attachment ... to a pole, duct, conduit, or right-of-way owned or controlled by a utility.” Utility is defined in section 224(a)(1) as "any person ... who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications.”