SOUTHERN COMPANY SERVICES,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

United Telecom Council,
et al., Intervenors.

Nos. 01-1326, 01-1328, 01-1372, 01-
1377, 01-1378 and 01-1380.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 4, 2002.

Decided Dec. 20, 2002.

J. Russell Campbell argued the cause for petitioners. With him on the briefs were Andrew W. Tunnell, Eric B. Langley, Jennifer M. Buettner, Charles A. Zdebski, Shirley S. Fujimoto, Christine M. Gill, Thomas P. Steindler, Erika E. Olsen, Jill M. Lyon, Brett W. Kilbourne, and Laurence Brown. John D. Sharer entered an appearance.

Gregory M. Christopher, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Jane E. Mago, General Counsel, John E. Ingle, Deputy Associate General Counsel, Robert B. Nicholson and Robert J. Wiggers, Attorneys, United States Department of Justice. John J. Powers III entered an appearance.

Daniel L. Brenner, Neal M. Goldberg, David L. Nicoll, Thomas F. O'Neil III, William Single IV, Paul Glist, John D. Seiver, Geoffrey C. Cook, Brian M. Josef, and Anthony C. Epstein were on the brief for intervenors National Cable & Telecommunications Association, et al.

Before: EDWARDS, ROGERS, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, Southern Company Services along with a dozen owners of utility poles and conduits (collectively, "utilities" or "petitioners") petition this court for review of three Federal Communications Commission ("FCC" or "Commission") Orders implementing amendments to the Pole Attachments Act (the "Act"), 47 U.S.C. § 224 (2000). Under the Act, the owners of poles and conduits have an obligation to lease space to companies that wish to "attach" cables or wires. The statute gives the FCC authority to "regulate the rates, terms, and conditions" in the market for attachment space and to "adopt procedures necessary and appropriate to hear and resolve complaints" regarding these matters. *Id.* § 224(b)(1). In the disputed Orders, the Commission announced regulations and procedures designed to assure that telecommunications providers can obtain the attachment space at just and reasonable rates.

In July 1997, the FCC adopted a Notice of Proposed Rule Making ("NPRM") relating to the implementation of § 703(e) of the Telecommunications Act of 1996 to amend the Commission's rules and policies governing pole attachments. *In the Matter of Implementation of Section 703(e) of the Telecommunications Act of 1996, Amendment of the Commission's Rules and Policies Governing Pole Attachments, Notice of Proposed Rule Making,* 12 F.C.C.R. 11,725, 1997 WL 453355 (Aug. 12, 1997), *reprinted in* Joint Appendix ("J.A.") 297-326. In February 1998, after notice and comment, the Commission announced rules governing reasonable rates for telecommunications attachments and guidelines for nondiscriminatory access to poles and conduits. *Implementation of Section 703(e) of the Telecommunications Act of 1996, Amendment of the Commission's Rules and Policies Governing Pole Attachments, Report and Order,* 13 F.C.C.R. 6,777, 1998 WL 46987 (Feb. 6, 1998), *("Telecom Order"), reprinted in* J.A. 213-96. In March 1997, the FCC adopted a NPRM relating to the maximum just and reasonable rates utilities may charge for attachments made to a pole, duct, conduit or right-of-way. 12 F.C.C.R. 7,449, 1997 WL 119618 (Mar. 14, 1997). In April 2000, following notice and comment, the Commission revised the methodology and application of the rate formula. *Amendment of Rules and Policies Governing Pole Attachments, Report and Order,* 15 F.C.C.R. 6,453, 2000 WL 339774 (Apr. 3, 2000) *("Fee Order"), reprinted in* J.A. 79-158. Finally, in May 2001, the FCC clarified and revised its two previous orders, answering petitions from interested parties in a consolidated proceeding. *In the Matter of Amendment of the Commission's Rules and Policies Governing Pole Attachments; In the Matter of Implementation of Section 703(e) of the Telecommunications Act of 1996, Consolidated Partial Order on Reconsideration,* 16 F.C.C.R. 12,103, 2001 WL 575495 (May 25, 2001) *("Reconsideration Order"), reprinted in* J.A. 1-78.

The utilities contend that the new rules exceed the FCC's enforcement authority and interfere with their rights to reasonably deny pole, duct, conduit, and right-of-way space. Petitioners also claim that the rules betray the requirements of reasoned decision-making under the Administrative Procedure Act ("APA").

On the record presented, we find that the FCC Orders are premised on reasonable interpretations of the Act and that the disputed rules do not interfere with petitioners' rights to negotiate contracts or to deny space for legitimate reasons. Certain of the disputed rules are unripe for review, so we offer no judgment on them. We otherwise hold that, in promulgating the disputed Orders, the FCC took into account the relevant factors, provided reasoned explanations for its decisions, and grounded its justifications in record evidence. Accordingly, we reject petitioners' claim that the rules are "arbitrary, capricious or contrary to law," and hereby deny the petitions for review.

## I. BACKGROUND

In 1978, Congress enacted the Pole Attachments Act to curb anti-competitive tendencies that limited the growth of the communications market. Pub.L. No. 95-234, 47 U.S.C. § 224 (1978); *see also Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.,* 534 U.S. 327, 330, 122 S.Ct. 782, 784-85, 151 L.Ed.2d 794 (2002); *FCC v. Fla. Power Corp.,* 480 U.S. 245, 247-48, 107 S.Ct. 1107, 1109-10, 94 L.Ed.2d 282 (1987). The then-nascent cable industry relied heavily upon the space on utility poles to secure the wires that delivered the signals to consumers. Since building new poles was prohibitively expensive, cable operators instead leased existing space

from utilities (usually electricity and telephone service companies). *Fla. Power Corp.*, 480 U.S. at 247, 107 S.Ct. at 1109 ("Utility company poles provide, under such circumstances, virtually the only practical physical medium for the installation of television cables."). However, utilities often exploited their market position to charge excessively high attachment rates. To restrain this practice, Congress sought to "establish a mechanism whereby unfair pole attachment practices may come under review and sanction, and to minimize the effect of unjust or unreasonable pole attachment practices on the wider development of cable television service to the public." S. REP. No. 95-580 (1977) ("*Senate Report*"), *reprinted in* 1978 U.S.C.C.A.N. 109.

The original provisions in the Act gave the FCC authority to "regulate the rates, terms, and conditions" for attachment contracts and the authority to assure that such rates are "just and reasonable." 47 U.S.C. § 224(a) (1978). The Act defined a "pole attachment" as "any attachment made by a cable television system to a pole, duct, conduit or right of way controlled by a utility." *Id.* § 224(a)(4). Under the Act, the Commission could set rates ranging from no less than "the additional cost of providing the pole attachments" to no more than the share of the total operating expenses in proportion to the percentage of space on the pole occupied by the cable carrier. *Id.* § 224(d)(1); *see also Fla. Power Corp.*, 480 U.S. at 248, 107 S.Ct. at 1110. The FCC's jurisdiction to enforce the statute applied in all places where state agencies had not previously adopted regulations. *See Senate Report*, 1978 U.S.C.C.A.N. at 110.

Responding to the development of telecommunications technologies during the intervening years, Congress substantially amended 47 U.S.C. § 224 in the 1996 Telecommunications Act, Pub.L. No. 104-104, 110 Stat. 56 (1997). The major changes in the Act reflect the view that telecommunications companies offering new services to the public should enjoy protections similar to those that the 1978 Act made available to the cable industry. *See* H.R. CONF. REP. No. 104-458 (1996), *reprinted in* 1996 U.S.C.C.A.N. 125. Congress determined that expanding the Act's scope in this manner would ultimately improve telecommunications service options for consumers.

Three specific changes in the Act are relevant to the present case. First, the amended statute broadens the definition of "pole attachment" to include connections made by cable operators or any other "provider of telecommunications service" to poles, ducts, conduits, or rights-of-way owned or controlled by a utility. 47 U.S.C. § 224(a)(4). The Act also calls on the FCC to develop a separate attachment rate scheme for telecommunications providers. *Id.* § 224(e). Finally, the Act requires owners to provide "non-discriminatory access" to attachers seeking space on poles, ducts, conduits, and rights-of-way. *Id.* § 224(f)(1). An owner may deny space "where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes." *Id.* § 224(f)(2).

The contested issues in this case fall into four general categories. First, the Commission updated its formula for allocating the cost of "other than usable" (or "unusable") space. The Act directs that "[a] utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities." *Id.* § 224(e)(2). Thus,

the maximum rate for any single attacher decreases as the total number of attaching entities grows. In the *Reconsideration Order,* the FCC announced that it would calculate the costs for unusable space based on the following definition:

> The term "attaching entities" includes, without limitation and consistent with the Pole Attachment Act, any telecommunications carrier, incumbent or other local exchange carrier, cable operator, government agency, and any electric or other utility, whether or not the utility provides telecommunications service to the public, as well as any other entity with a physical attachment to the pole.

*Reconsideration Order* at 12,133-34 ¶ 59, J.A. 29 (footnote omitted). This position reversed the Commission's position in the *Telecom Order* that both municipal agencies and utilities with wires on the pole were subject to the "attaching entities" classification only if they provided telecommunications services. *Id.* at 12,131-32 ¶ 57, J.A. 28; *see also Telecom Order* at 6,800-04 ¶ 48-54, J.A. 237-40. To aid in rate calculations, the Commission announced that poles located in areas with more than 50,000 people have a presumed average of five attachers, while poles located in areas with fewer than 50,000 people have a presumed average of three attachers. *Reconsideration Order* at 12,139-40 ¶ 71, J.A. 35-36.

Second, pursuant to § 224(e)(1), the FCC adopted a complaint resolution process for situations "when the parties fail to resolve a dispute over [rate] charges." Under the applicable rules, an attacher may "sign" a contract with a utility and later file a complaint with the FCC to contest an element of that agreement deemed to be unfair. *Id.; Telecom Order* at 6,780-90 ¶ 16-21, J.A. 223-26; *Reconsideration Order* at 12,112 ¶ 12, J.A. 8. This is the so-called "sign and sue" rule.

Third, the Commission adopted regulations for overlashing, a technique whereby a telecommunications provider attaches a wire to its own (or, for third-party overlashing, to other attachers') existing wires. The FCC rule provides that a third-party overlasher "shares space with the host attachment" and, therefore, does not qualify as an "attaching entity" for purposes of the attachment rate formula. *Reconsideration Order* at 12,145 ¶ 83, J.A. 41. This rule changed the position taken by the FCC in the *Telecom Order. See Telecom Order* at 6,809-10 ¶ 68-69, J.A. 245-46. The Commission also clarified that an overlashing party does not need to obtain advance consent from a utility if that party has a primary wire attachment already in place. *Reconsideration Order* at 12,144-45 ¶ 82, J.A. 40-41. The FCC recognized, however, that "a utility is entitled to notice of the overlashing," and that the utility may recover any costs incurred for strengthening the pole to support the weight of additional wires. *Id.*

Fourth, the FCC adopted rules concerning the rate formula for attachment space in conduits – the hollow underground structures that carry cables and telecommunications wires. In both the Fee Order and the *Reconsideration Order,* the Commission determined that conduits contain no unusable space. *Id.* at 12,149 ¶ 93, J.A. 45; *Fee Order* at 6,496-97 ¶ 89-90, J.A. 123. The Commission found that any conduit area that could be utilized for a specific purpose was "usable" and therefore was subject to the rate formula:

> [A]n electric utility is allowed to reserve capacity for future business purposes under a bona fide business plan, but must allow that capacity to be used for attachments until an actual business need arises. For whatever reason capacity may be reserved or designated for special uses, by or on behalf of the

utility, and regardless of who may benefit directly or indirectly from those uses, the capacity is available for use and therefore remains part of the total capacity of the conduit for rate determination purposes.

*Reconsideration Order* at 12,150 ¶ 94, J.A. 46 (footnotes omitted). The FCC also adopted an administrative presumption that each conduit attachment occupies only half the space within each duct (*i.e.,* a subsection of the conduit). *Id.* at 12,150 ¶ 95, J.A. 46; *Telecom Order* at 6,829 ¶ 115, J.A. 265-66. Just as it found that its presumptions for the number of entities on a pole were rebuttable, the agency noted that any utility could offer data showing that specific attachments actually used a greater share of duct space. *Id.*

## II. ANALYSIS

Petitioners assert that the disputed rules and procedures should be vacated, because they violate the Act and betray the precepts of reasoned decision-making under § 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A).

■ In deciding whether to defer to the FCC's construction of the Pole Attachments Act, we adhere to the tests enunciated by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). In *Chevron,* the Court held that, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43, 104 S.Ct. at 2781. This is so-called *"Chevron* Step One" review. If Congress "has not directly addressed the precise question" at issue, and the agency has acted pursuant to an express or implic-

it delegation of authority, the agency's interpretation of the statute is entitled to deference so long as it is "reasonable" and not otherwise "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44, 104 S.Ct. at 2782. This is so-called *"Chevron* Step Two" review. *Mead* reinforces *Chevron*'s command that *Chevron* deference to an agency's interpretation of a statute is due only when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead,* 533 U.S. at 226-27, 121 S.Ct. at 2171.

In this case, there is no doubt that the FCC promulgated the new rules pursuant to congressionally delegated authority and that the disputed Orders purport to have the force of law. Petitioners contend, however, that certain provisions in the new rules exceed the Commission's authority under the Act. We reject this contention. The intent of Congress is not unambiguously expressed in the provisions of the Act at issue in this case. Nonetheless, the FCC's constructions of the Act are entirely reasonable and thus deserving of deference under *Chevron* Step Two.

Petitioners also contend that, whether or not the new rules reflect permissible interpretations of the statute, they should be vacated as "arbitrary and capricious" under the APA. In *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), the Supreme Court explained the APA's "arbitrary and capricious" test, as follows:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory

explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Id.* at 43, 103 S.Ct. at 2866-67 (citations omitted). As the Court makes clear, the scope of judicial review under this standard is narrow. Pursuant to this standard, we can find no basis for overturning the agency rules at issue in this case.

## A.  The Pole Space Rules

■  The Act sets forth fairly general rules regarding allocations of the cost of usable and unusable space for attachments. *See* 47 U.S.C. § 224(d), (e). As noted above, the rate for any single "attaching entity" varies inversely with the total number of attachers. *Reconsideration Order* at 12,131-32 ¶ 55, J.A. 27-28. In applying the statute, the Commission's rules prescribe that any party with a physical attachment is an "attaching entity." *Reconsideration Order* at 12,133-34 ¶ 59, J.A. 29. This means that even municipali-

ties and utility owners themselves may be deemed "attaching entities." Petitioners challenge this rule, claiming that the statute only allows telecommunications and cable companies to be counted as attaching entities.

Petitioners' view of the statute is wrong. The specific provision at issue, 47 U.S.C. § 224(e)(2), merely says that the FCC must equally apportion costs "among all attaching entities." Petitioners argue, however, that the statutory definitions of "pole attachment," § 224(a)(4), and "telecommunications carrier," § 224(a)(5), which do not include utilities and municipalities, show that Congress meant to exclude utilities and municipalities from the category of attaching entities. This argument fails, because the cited provisions do not establish what parties qualify as "attaching entities" for purposes of apportioning costs under § 224(e)(2). In fact, to the extent the Act mentions "entities" at all, the term bears different meanings depending upon the context. *Compare . id.* § 224(h) (describing obligations of an "owner" and "any entity" when either modifies a pole attachment), *with id.* § 224(i) (prohibiting charges to a party for attachment changes by "any other entity" *including owners*). The most that can be said is that § 224(e)(2) is unclear on whether utilities or municipalities count as "attaching entities" for purpose of apportioning costs.

The FCC's decision to count utilities among "attaching entities" is an eminently reasonable interpretation of the statute. The FCC reasoned that its broader definition better reflects the operative language in the Act. Congress chose not to use a more specific term like "telecommunications carrier" or "provider of telecommunications services," which would have evidenced an intent to distribute the unusable space costs more narrowly. *Reconsidera-*

*tion Order* at 12,13334 ¶ 59, J.A. 29-30. The broader definition is also justified because it limits the financial burden on telecommunications providers and therefore encourages growth and competition in the industry. Finally, the FCC noted that, absent the rule, a telecommunications provider might bear the entire cost of unusable space where it is the sole paying attacher. *Id.* at 12,134 ¶ 60, J.A. 30. In sum, the agency's interpretation of § 224(e)(2) is clearly a permissible interpretation of the statute to which we must defer.

Petitioners complain that the FCC acted unreasonably when it "reversed course" in its *Reconsideration Order,* removing all of the limitations that it had previously embraced for counting attaching entities in the *Telecom Order. Compare Reconsideration Order* at J.A. 28-30 *with Telecom Order* at J.A. 236-40. But this reversal does not render the new rule infirm. Rather, the issue is whether the agency furnished a reasoned explanation for its changed position. *PSWF Corp. v. FCC,* 108 F.3d 354, 357 (D.C.Cir.1997); *Greater Boston Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970). There is no doubt in this case that the FCC's changed position was fully justified and reasonable. The same reasons that justify the agency's permissible interpretation of the statute justify its decision to change from a narrow to a broader definition of attaching entities. *Reconsideration Order* at 12,133-34 ¶ 58-61, J.A. 29-30. As noted above, the FCC reasonably concluded that the broader definition better served the goals of the Act.

█ Petitioners further claim that the FCC violated the Act and acted unreasonably in adopting presumptions for the number of attaching entities. The *Reconsideration Order* states:

In order to expedite the process of developing average numbers of attaching entities, and allow utilities to avert the expense of developing location specific averages, we provide two rebuttable presumptive averages for use in our *Telecom Formula.* This gives both small and large utilities the option of not conducting a potentially costly and burdensome exercise necessary to develop averages based on their company specific records. The adoption of presumptive averages should reduce cost and effort by all parties....

In the *Telecom Order,* we did not establish presumptions, but said we believed the most efficient and expeditious manner to calculate a presumptive number of attaching entities would be for each utility to develop its own presumptive average number of attaching entities. We now reconsider that decision and set rebuttable presumptive average numbers of attaching entities for our two categories, urbanized and non-urbanized. We are now persuaded that utilities and attaching entities would benefit from our providing presumptive averages for their use. Our establishment of presumptive averages will expedite the process and allow utilities to avert the expense of developing location specific averages. As with all our presumptions, either party may rebut this presumption with a statistically valid survey or actual data.

*Id.* at 12,139 ¶ 69-70, J.A. 35 (footnotes omitted).

The FCC's decision to use rebuttable presumptions is neither inherently unlawful nor facially unreasonable. We reject petitioners' suggestions to the contrary. However, because the FCC has yet to apply the presumptions, we have no basis upon which to judge the reasonableness of the new rules as applied. The presumptions are merely *presumptions* that are subject to rebuttal in any case. And, un-

der the applicable rule, utilities are free to substitute their own surveys to establish more precise data on the numbers of attaching entities. Absent a live controversy regarding a particular application of the presumptions, petitioners' challenges to the presumptions as applied are unfit for review. Because the "institutional interests" of the agency and the court favor postponing review, and because petitioners have pointed to no "hardship" that will result from delaying review, we dismiss the as-applied challenges to the presumptions for want of ripeness. *See City of Houston v. Dep't of Housing and Urban Dev.*, 24 F.3d 1421, 1430-32 (D.C.Cir.1994).

## B. The Overlashing Rules

Petitioners contest the FCC's rules on overlashing on several grounds. First, they claim that the rules force utilities to violate the Act's nondiscrimination provision, because they establish different norms for an overlashing entity and other attaching entities. Second, they contend that without a rule that overlashers give prior notice to utilities, owners cannot exercise their right to deny access for the reasons listed in the statute. Finally, they suggest that the FCC procedurally erred by ignoring their comments in drafting these rules. We find no merit in these claims.

■ Because overlashing by definition involves a physical connection to other wires and not to the pole itself, the Commission concluded that a utility is not entitled to charge overlashing parties for pole space. *Reconsideration Order* at 12,142 ¶ 76, J.A. 38. This is a permissible construction of the statute, one that comports with the FCC's permissible construction of "attaching entities."

The overlashing rules allow utilities to charge overlashers "make ready" costs if the overlashing wires require enhancing the strength of the pole. *Id.* at 12,142 ¶ 77, J.A. 38-39. And a utility can also deny access to overlashers for reasons of insufficient capacity, safety or reliability as described in the Act. *See* 47 U.S.C. § 224(f)(2); *Reconsideration Order*, at 12,-141 ¶ 74, J.A. 37. Overlashers are not required to give prior notice to utilities before overlashing. However, the FCC rules do not preclude owners from negotiating with pole users to require notice before overlashing. *Id.* at 12,144 ¶ 82, J.A. 41 ("We clarify that it would be reasonable for a pole attachment agreement to require notice of third party overlashing."). Whether, and to what extent, such a contract provision might be enforceable is a question not presently before us. Therefore, we have no occasion to decide that issue.

In short, the overlashing rules show due consideration for the utilities' statutory rights and financial concerns. The record shows that these matters played a role in the FCC's decision, but petitioner's concerns were balanced with the efficiency gains that overlashing brings to the industry. *See id.* at 12,140-41 ¶ 73, J.A. 36-37.

## C. "Sign and Sue" Rule

■ Petitioners also contend that the FCC's rule allowing entities to "sign and sue" violates the Act's plain meaning and is arbitrary and capricious. According to petitioners, attaching parties should be required to take exception to the terms and conditions of an agreement when the attachment agreement is negotiated or be estopped from filing a complaint about those terms after the agreement is executed. Petitioners argue that, under the Commission's rule, attachers can keep the benefit of their bargains as they see fit and simultaneously seek to avoid disfavored provisions. "The Commission's decision to play both negotiator and arbitrator, thus

displacing any true market negotiations, is unlawful," say petitioners. Petitioners' Br. at 37. We disagree.

The Commission has a duty to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b)(1); *see also id.* § 224(e)(1) (directing FCC to establish regulations to govern when "parties fail to resolve a dispute over such charges"). Complying with these statutory mandates gives the FCC jurisdiction to resolve contract disputes between the parties, save possibly where state regulations occupy the field. *Id.* § 224(c)(1).

Petitioners' argument implicitly suggests that, under the disputed rule, the FCC seeks to retain unfettered authority to abrogate the *lawful* terms of private settlements merely at the behest of attachers. We see nothing in the rules to support this view. The agency's brief to this court aptly disposes of this issue:

> The utilities do not describe or explain under what circumstances the Commission's condoning of "sign and sue" undermines reliance on private negotiation or when exactly it is unfair to the utilities, but we observe that "sign and sue" is likely to arise only in a situation in which the attacher has agreed, for one reason or another, to pay a rate above the statutory maximum or otherwise relinquish a valuable right to which it is entitled under the Pole Attachments Act and the Commission's rules. If the rates and conditions to which the attacher later objects are within the statutory framework, then the utility has nothing to·fear from the attacher's complaint. The attacher would not be entitled to relief.

> For example, one scenario in which "sign and sue" is likely to arise is when the attacher acquiesces in a utility's "take it or leave it" demand that it pay more than the statutory maximum or relinquish some other valuable right – without any *quid pro quo* other than the ability to attach its wires on unreasonable or discriminatory terms. Of course the Pole Attachments Act was designed to prevent such an exercise of monopoly power that would nullify the statutory rights of cable systems or telecommunications carriers to obtain both immediate access and timely regulatory relief to the extent access is unreasonable or discriminatory. The utility is statutorily required to grant prompt, nondiscriminatory access and may not erect unreasonable barriers or engage in unreasonable delaying tactics. So in this scenario, where the utility gives nothing of value in exchange for the attacher's coerced "agreement" to accept unreasonable or discriminatory access, the utility has no right to complain if the attacher "signs and sues" to challenge this abuse of the utility's monopoly control over the essential transport facilities.

> It is conceivable that in some circumstances, the utility may give a valuable concession in exchange for the provision the attacher subsequently challenges as unreasonable. As a hypothetical example, the utility might agree to absorb some of the make-ready or attachment costs that are normally paid by the attachers in exchange for a higher rate. In that situation, the Commission could evaluate the reasonableness of the rate provisions as a package, and these provisions would rise or fall together without undermining the statutory policy in favor of voluntary dispute resolution.

Respondent's Br. at 42-43.

On the record at hand, we conclude that the rule is a reasonable exercise of the agency's duty under the statute to guaran-

tee fair competition in the attachment market. The agency's limited authority to review negotiated settlements is consistent with the statute and it does not interfere with any of the rights afforded petitioners under the Act.

### D. Conduit Space Rules

■ Finally, petitioners contend that the FCC's decisions on conduit space and fees are unlawful and unreasonable. According to petitioners, the *Reconsideration Order* fails to recognize that portions of conduits are unusable for purposes of computing the appropriate attachment formula. Petitioners also contend that, without explanation or support in the record, the FCC reversed the *Telecom Order* decision that conduit space reserved for maintenance and emergency use is reserved for the benefit of all conduit occupants; that such reservation renders that duct unusable; and that the costs of the space should be allocated to those who benefit from it. Petitioners argue further that the FCC engaged in arbitrary and capricious decision-making when it derived a rebuttable presumption that an attacher occupies only one-half of a duct or conduit. We find no merit in these contentions.

The Commission did not shift its position without explanation or good reason, as petitioners contend, when it adopted the unusable space rule. Rather, the Commissioner's *Reconsideration Order* is cogent on this issue:

In the *Fee Order*, we reviewed the Fee Order *Notice* filings as well as the Telecom Order petition filings and concluded that other than collapsed ducts which are not counted in determining total capacity, there is no unusable capacity in a conduit. This was a departure from our conclusion in the Telecom Order and we now affirm our conclusion in the *Fee Order*. The total capacity of

a duct or conduit is the entire volume of available capacity in the conduit system. All costs associated with the construction of the conduit system are considered in determining the cost of this total capacity.

. . .

We will not allow capacity designated for maintenance, future business plans, or municipal set-asides to be subtracted from the total duct or conduit capacity for rate determination purposes. The record supports our analysis that capacity in a duct or conduit that is usable for any of these purposes is part of the "total duct or conduit capacity." For example, a utility may set-aside capacity for maintenance or emergencies so that unoccupied capacity is available into which a temporary cable may be placed and spliced into a damaged cable. Capacity so designated is usable in the event it is needed, and available for use by the utility at any time for any purpose, and is therefore part of the total available conduit capacity. Such reservation of capacity is not necessarily identified by a specific duct or location, can be treated, used, withdrawn or discarded at the sole discretion of the utility, and must be considered part of the total capacity of the conduit.

*Reconsideration Order*, 12,147, 12,149 ¶ 88, 93, J.A. 43, 47.

The FCC's rule adopting a presumption for duct space is not facially invalid. The rule merely establishes a *rebuttable* presumption. *See id.* at 12,150-51 ¶ 95, J.A. 46; *see also id.* at 12,152 ¶ 98, J.A. 48 ("When the actual percentage of capacity is known, it can and should be used instead of the one half presumption."). The possibility that a utility can present information showing that an attached wire or cable occupies more than half of the duct space

makes it clear that the rule is not facially unreasonable.

We will not otherwise address the merits of this rule, however, because petitioners' challenge to the rule as applied is unripe. *See City of Houston,* 24 F.3d at 1430-32. The same considerations that prompted our dismissal of petitioners' as-applied challenge to the rule regarding presumptions for the number of attaching entities apply here as well.

### III. CONCLUSION

For the reasons stated above, the petitions for review of the FCC Orders are hereby denied.