[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 29, 2003
THOMAS K. KAHN
CLERK

No. 02-15608

FCC Docket No. PA 00-005

GEORGIA POWER COMPANY,

Petitioner,

versus

TELEPORT COMMUNICATIONS
ATLANTA, INC., DUKE ENERGY
CORP., AMERICAN ELECTRIC
POWER SERVICE CORP.,

Intervenors,

FEDERAL COMMUNICATIONS
COMMISSION, UNITED STATES
OF AMERICA,

Respondents.

_____

Petition for Review of an Order of the
Federal Communications Commission

_____

**(September 29, 2003)**

Before BLACK and MARCUS, Circuit Judges, and MIDDLEBROOKS[*], District Judge.

BLACK, Circuit Judge:

In this petition for review, Georgia Power Company challenges the Federal Communications Commission (FCC) order affirming a decision of the FCC's Cable Services Bureau which reduced Georgia Power's $53.35 annual pole rental rate to between $6.56 and $8.24. FCC has jurisdiction over utility pole attachments for cable and telecommunications providers under the Pole Attachment Act of 1978, as amended by the Telecommunications Act of 1996, specifically 47 U.S.C. § 224. Georgia Power contends in its petition that FCC acted arbitrarily and capriciously in numerous ways when it ruled on the pole attachment rate dispute between Georgia Power and intervenor Teleport Communications Atlanta, Inc. (Teleport). We conclude that FCC did not act arbitrarily or capriciously, and we therefore deny the petition for review.

## I. BACKGROUND

The Eleventh Circuit appears to have become a locus for pole attachment disputes. A fuller statement of the legal background for this dispute may be found in our several previous opinions involving pole attachments. *See Ala. Power Co. v.*

---

[*]Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

*FCC*, 311 F.3d 1357 (11th Cir. 2002), *petition for cert. filed* 71 U.S.L.W. 3653 (U.S. Apr. 4, 2003) (No. 02–1474); *Gulf Power Co. v. FCC*, 208 F.3d 1263, 1266–70 (11th Cir. 2000) (*Gulf Power 2*), *rev'd in part sub nom. Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 122 S. Ct. 782 (2002) (*Gulf Power 3*); *Gulf Power Co. v. United States*, 187 F.3d 1324, 1326–28 (11th Cir. 1999) (*Gulf Power 1*).

To summarize briefly, cable companies have always attached their cables to utility poles of power and telephone companies in order to take advantage of the pre-existing network of poles, conduits, and rights-of-way. The lack of alternatives to these existing poles allowed utilities to charge cable companies monopoly rents for their attachments. Congress intervened in 1978 with the Pole Attachment Act, which authorized FCC to specify a range of rents that utility companies could charge once they voluntarily decided to allow cable companies to attach to utility poles. With the Telecommunications Act of 1996, Congress mandated access to utility poles for both cable and telecommunications services providers. Access for telecommunications companies was an entirely new development in the 1996 Act. Prior to that, telecommunications attachments to utility poles were governed only by market forces. Under the regime established by the Telecommunications Act, FCC was charged with creating a new telecommunications formula to set attachment rates for telecommunications attachers. The telecommunications formula was a new formula,

3

different from the cable formula that FCC had promulgated under the 1978 Pole Attachment Act for cable companies.

Because access to utility poles was mandatory and involved physical occupation of part of the poles, we concluded that pole attachments pursuant to the new Telecommunications Act effected a taking that required just compensation. *See Gulf Power 1*, 187 F.3d at 1328. We left it to FCC to determine in the first instance what just compensation would be. *Id.* at 1333. Utility companies subsequently challenged, *inter alia*, the FCC rate formula for pole attachments, but because no specific FCC determination was at issue, we declined to rule on whether the FCC formula provided just compensation. *See Gulf Power 2*, 208 F.3d at 1272–73. More recently, we have determined that some of the pole attachment rates promulgated by FCC provide just compensation to utility companies, at least in the absence of specific evidence to the contrary. *See Ala. Power*, 311 F.3d at 1370–71.

The specific dispute in this case takes place against the background of the ever-shifting regulatory regime governing pole attachments. In setting the pole rental rate, the number of pole attachers is a crucial factor. This is so because rent can be assessed for the unusable space on a utility pole (essentially the part of the pole near the ground where no attachments can be placed) but which is nonetheless necessary to support the remainder of the pole, where attachments can be placed. According to

4

the Telecommunications Act, the costs associated with the unusable space must be partly shared on a proportional basis by all entities with attachments on the pole. *See* 47 U.S.C. § 224(e)(2). The higher the number of attachers, therefore, the lower the pole rent will be.

In 1998, FCC promulgated the *Telecom Order*, which required each utility to develop a presumptive average number of attaching entities for its poles, based on their locations. *In the Matter of Implementation of Section 703(e) of the Telecommunications Act of 1996: Amendment of the Commission's Rules and Policies Governing Pole Attachments*, 13 F.C.C.R. 6777 at ¶¶ 78–79 (1998) (*Telecom Order*). The *Telecom Order* allowed for challenges to the utility's presumptive average number of attachers; when an appropriate challenge is filed, the utility can then be required to justify its presumption. *See id.*

Because of complaints from utilities about the difficulty of substantiating their presumptive average number of attachers, FCC changed this rule (via notice and comment rulemaking) so that the FCC itself would set a presumptive average. *In the Matter of Amendment of Commission's Rules and Policies Governing Pole Attachments: In the Matter of Implementation of Section 703(e) of the Telecommunications Act of 1996*, 16 F.C.C.R. 12,103 (2001) (*Recon Order*). For non-urban areas, FCC set the presumptive average at three attachers; for urbanized

areas, the presumption was five attachers. *Id*. at 12,139–40, ¶¶ 71–72. The presumptions were based in part on the near-universality of the kinds of attachments found on utility poles; FCC reasoned, for example, that there would be electric, telephone, and cable attachments in non-urbanized areas, yielding a presumption of three attachers. *Id*. at 12,139–40, ¶ 71. In urbanized areas, the presumption of five attachers included electric, telephone, cable, competitive telecommunications, and government agency attachments. *Id*. at 12,140, ¶ 72. FCC's presumptions were rebuttable by either party. *Id*. at 12,139, ¶ 70.

On October 10, 2000, before the *Recon Order* issued, Georgia Power notified Intervenor Teleport Communications that it was imposing an annual pole attachment rate of $53.35. After some limited negotiations with Georgia Power, Teleport filed a complaint with the FCC's Cable Services Bureau,[1] arguing that Georgia Power's new rate was in excess of the maximum rate permissible under the Pole Attachment Act. In its reply to the complaint, Georgia Power argued that the FCC formula failed to provide just compensation because it relied on historical costs rather than fair market value. Teleport filed a reply objecting to Georgia Power's market-based calculations. When Georgia Power attempted to file a supplemental response, the

---

[1]The Cable Services Bureau is the administrative sub-unit of the FCC responsible for adjudicating, in the first instance, complaints related to pole attachments.

Cable Services Bureau ordered it stricken from the record. The Cable Services Bureau subsequently ruled on Teleport's complaint, striking Georgia Power's rates and substituting lower, incremental rates. *In the Matter of Teleport Communications Atlanta, Inc. v. Ga. Power Co.*, 16 F.C.C.R. 20,238, 20,243–44, ¶ 13 (2001) (*Teleport*).

Importantly, the Cable Services Bureau applied the FCC's presumptions from the *Recon Order* when it ruled on Teleport's complaint, even though the *Recon Order* issued six months after Teleport filed its complaint. The Bureau ruled that Georgia Power had failed to justify its lower average number of attachers, and without adequate justification, the higher presumptive averages from the *Recon Order* would apply. *See Teleport*, 16 F.C.C.R. at 20,243, ¶ 11.

On December 14, 2001, one month after the Cable Services Bureau ruled on the Teleport complaint, Georgia Power filed an application for administrative review by the full Commission. While that application was pending, Georgia Power filed with the Eleventh Circuit the petition for review at docket number 02-10222 (the first petition). Oral argument was scheduled for October 30, 2002.

On October 8, 2002, however, the full FCC issued an order affirming the Cable Services Bureau's order. *See In the Matter of Teleport Communications Atlanta, Inc. v. Ga. Power Co.*, 17 F.C.C.R. 19,859 (2002) (*Final Order*). In its order, FCC

disavowed the Cable Services Bureau's reliance on the presumptions established in the *Recon Order*. *Id.* at 19,866–67, ¶ 20 Instead, the full FCC "independently adopt[ed]" the same presumptions, based in part on the rationale behind the *Recon Order*. *Id.* According to FCC, the Cable Services Bureau's reliance on the *Recon Order* was harmless error. Georgia Power then filed another petition for review (at docket number 02-15605) of the full FCC's order (the second petition). The panel continued the oral argument on the first petition and consolidated it with the second petition.[2]

On November 14, 2002, another panel of this Court decided *Alabama Power*, thereby ruling on several important issues extant in the consolidated petitions in this case. We address one of those important issues in our companion opinion dismissing the first petition. *See Ga. Power Co. v. FCC*, No. 02-10222 (11th Cir. _____, 2003). We ordered supplemental briefing addressing *Alabama Power* prior to oral arguments on the second petition.

On May 1, 2003, the panel heard oral arguments on the consolidated petitions, focusing primarily on the issues presented in the second petition and the supplemental briefing thereto.

---

[2]The panel retained jurisdiction over the two consolidated petitions and waited until briefing was complete to schedule oral argument.

## II. DISCUSSION

Georgia Power raises several different issues in its attempt to show the infirmities of FCC's final order affirming the Cable Services Bureau's decision to reduce Georgia Power's pole attachment rates. Those issues are as follows:

1. Whether FCC's shifting of the burden of proof to establish the average number of attaching entities and acceptance of Teleport's proffered number with no factual support was arbitrary and capricious.

2. Whether FCC acted arbitrarily and capriciously and otherwise unlawfully in "independently adopting" rebuttable presumptions as to the average number of attaching entities and applying them to Georgia Power.

3. Whether FCC's refusal to allow additional evidence from Georgia Power as to the average number of attaching entities was arbitrary and capricious.

4. Whether FCC's definition of "attaching entities" for purposes of the telecommunications rate violated the plain language of the Pole Attachments Act.

5. Whether FCC's assertion of jurisdiction prior to real negotiations between Georgia Power and Teleport violated the plain language of the Telecommunications Act.

6. Whether FCC failed to provide Georgia Power with just compensation for the physical taking of its property.

We will address each of these issues *seriatim*.

9

A. *Georgia Power's Burden in FCC's Evidentiary Framework*

The starting point for our analysis is the basic burden of proof that obtained in the pole attachment rate dispute between Georgia Power and Teleport. FCC concluded that Georgia Power had failed to justify its proposed rate using any acceptable rate formula. *See Final Order*, 17 F.C.C.R. at 19,863, ¶ 12. In its petition for review, Georgia Power contends it did adequately justify its proposed rate through its initial submission of an affidavit by Thomas G. Park, and that Park's affidavit was sufficient under the then-extant rules of the *Telecom Order*. Under the *Telecom Order*, FCC required each utility to develop a presumptive average number of attachers and, upon request, supply to any attaching entity "the methodology and information by which a utility's presumption was determined." *Telecom Order*, 13 F.C.C.R. 6777, ¶ 78.

Georgia Power did not come close to meeting its burden to explain the methodology and information underlying its pole attachment rate. The *Final Order* identified two basic deficiencies in Georgia Power's submissions. First, it noted that Georgia Power's average number of 1.5922 was invalid because the minimum possible number of attachers was two. *Final Order*, 17 F.C.C.R. at 19,866, ¶ 17. Under both the *Telecom Order* and the *Recon Order*, Georgia Power was required to

include itself in the average number of attachers. Thus, an average number of 1.5922 would appear to be facially implausible.

Georgia Power has made no argument that rebuts this conclusion by FCC. Our independent review of the record leads us to suspect that the average of 1.5922 may not be quite so implausible, however. The calculations included with the Park affidavit include a line labeled "Avg. # of Attachments." The calculations also include a line labeled "Common Space/Average # of Attachments," with the quantity 11. What we find confusing about this entry, however, is that another line entry lists the "common space to allocate" as 28.5 feet. If we divide 28.5 feet by Georgia Power's proffered 1.5922 average number of attachers, we find the common space per attacher to be not 11 feet, but nearly 18 feet. Hypothetically, however, if we add one to Georgia Power's average of 1.5922—thereby adding Georgia Power itself as an attaching entity to whom common space must be allocated—the calculation of common space per attacher would then yield 11.[3] If this alternative were the correct calculation, Georgia Power's presumptive average number of attachers would not be quite so implausible. Remarkably, Georgia Power has never explained whether this possible interpretation of its calculations is accurate. We can at best only speculate,

---

[3] 28.5 feet of common space / 2.5922 average attachers (including Georgia Power) = 10.9945 feet per attaching entity.

11

and under the circumstances, we defer to the expertise of the FCC in interpreting the rate calculation.

The exact status of Georgia Power's proffered average number of attachers is ultimately beside the point, however, because of the second deficiency identified in the *Final Order*. Apart from any facial implausibility in Georgia Power's calculations, FCC also found that Georgia Power supplied no explanation or documentation that supported its figure of 1.5922 average attachers. *Final Order*, 17 F.C.C.R. at 19,866, ¶ 17. A utility is required to supply not just an average number of attachers, but also the methodology and underlying data supporting the proffered average number. *See* 47 C.F.R. § 1.1404(j). As FCC explained, Georgia Power provided none of the underlying data upon which its proffered average number of attachers was based. *Final Order*, 17 F.C.C.R. at 19,865, ¶ 15. Georgia Power's absolute failure to submit its underlying data contrasts significantly with Teleport's submissions accompanying its complaint; Teleport substantiated nearly all of the data underlying its rate calculations with information derived from Georgia Power's own records. The comparison of the two sets of rate calculations throws into specific relief the degree to which Georgia Power's submissions were deficient.

In addition, even if Georgia Power had provided data to explain how it arrived at its figure, it remains unclear what its figure represents or what methodology was

12

used to arrive at its figure. The Park Affidavit contains only the following parenthetical explanation of how the average was calculated: "no. of poles with cable attach. & no. of poles with telecom attach. divided by the total no. of poles with both cable and telecom attach." Whatever this ratio may actually represent, it does not appear to represent the average number of attachments to each of Georgia Power's poles. Georgia Power has done nothing to explain what it might mean. There is little wonder that FCC concluded Georgia Power's explanation of its proffered average was "meaningless." *Final Order*, 17 F.C.C.R. at 19,866, ¶ 15.

Finally, we note that the problems associated with Georgia Power's rate calculations were not limited to its failure to justify the average number of attaching entities. For example, Teleport's complaint relied on FCC presumptions for certain other numbers that figure into the rate calculation, including the presumed height of the pole and the presumed amount of unusable space. *See* 47 C.F.R. § 1.1404(g)(1)(xi)–(xii); *see also id*. § 1.1418. While those presumptions are rebuttable, Georgia Power simply substituted different figures without any explanation or justification. More importantly, Georgia Power's submissions were predicated on a replacement cost methodology rather than FCC's historical cost methodology, despite the fact that FCC had rejected the use of replacements costs from the very beginning of its pole attachment regulations.

In short, it appears that, because of its disagreements with FCC's regulations governing pole attachment rates, Georgia Power submitted pole attachment information that conformed to its own views of the best methodology for setting rates. *See Final Order*, 17 F.C.C.R. at 19,863, ¶ 12 ("[Georgia Power] substituted its own formula for calculating pole attachment rates."). As a result, Georgia Power steadfastly refused to supply FCC with all of the information it was required to provide in order to justify its pole attachment rate. It can come as little surprise that FCC concluded Georgia Power had failed to meet its burden of supplying the methodology and underlying data that substantiated its rate. We agree with FCC's conclusion.

B. *FCC's Independent Adoption of an Average Number of Attachers*

With Georgia Power having failed to establish an average number of attachers, FCC faced the problem of calculating a pole attachment rate without this crucial figure. The Cable Services Bureau solved this problem by taking the presumptive averages established in the *Recon Order* and applying them retroactively to the rate dispute between Teleport and Georgia Power. *See Teleport*, 16 F.C.C.R. at 20,242–43, ¶ 11. When the full FCC heard the rate dispute, however, it disavowed the Cable Services Bureau's retroactive application of those presumptive averages. *See Final Order*, 17 F.C.C.R. at 19,867, ¶ 20 ("Therefore, to the extent the Bureau

14

relied on the [*Recon*] *Order*, it was harmless error . . . .”).  The full Commission nonetheless employed the same presumptive averages from the *Recon Order* to calculate the pole attachment rate.  As FCC put it, “we hereby independently adopt these presumptions, based on the fact that they were proffered by Teleport in this case and were not refuted by [Georgia Power].  We also conclude that the rationale set forth in the [*Recon*] *Order* also applies here.”  *Id.*

In the first petition, Georgia Power argued that the Cable Services Bureau’s retroactive application of the presumptions established in the *Recon Order* was impermissible.  Georgia Power now argues that FCC’s decision to “independently adopt” those same presumptions based on Teleport’s “proffer” of those numbers was arbitrary and capricious in that it amounted to a retroactive rulemaking in violation of § 551(4) of the Administrative Procedures Act.  *See* 5 U.S.C. § 551(4).

As we explained *supra*, Part II.A, Georgia Power failed to establish its own average number of attachers in compliance with the regulatory regime at the start of Teleport’s pole attachment complaint proceeding.  *See Telecom Order*, 13 F.C.C.R. at ¶ 78.  Had Georgia Power done so, Teleport could have rebutted that average only by identifying and calculating the average number of attachments on Georgia Power’s poles, either by a complete inspection of the poles or with a statistically sound survey.  *Id.* ¶ 79.  Had Teleport supplied such rebuttal information, FCC could conceivably

15

have relied on it to calculate the rate. Unfortunately, Teleport's "proffer" of 3 and 5 attachers for non-urbanized and urban areas, respectively, did not meet the requirements of the *Telecom Order*. Where Teleport substantiated every other entry in its rate calculations with data provided by Georgia Power, Teleport did absolutely nothing to substantiate its proffered average number of attachers. All it explained, in a footnote, was that its calculations "illustrate[] two different scenarios with respect to the number of attaching entities among which unusable space is allocated: 3 entities and 5 entities." There is nothing to even suggest that Teleport had made an actual calculation or a statistically significant survey of the average number of attaching entities.

What FCC confronted, therefore, was a rate dispute in which neither party had provided sufficient information to establish the average number of attachments, the crucial figure that would have allowed FCC to calculate the pole attachment rate. Under FCC regulations, however, "[w]here one of the parties has failed to provide information required to be provided by these rules or requested by the Commission, or where costs, values or amounts are disputed, the Commission may estimate such costs, values or amounts it considers reasonable . . . ." 47 C.F.R. § 1.1409(a). In the absence of any sufficient information from either Georgia Power or Teleport, FCC

16

had the authority under § 1.1409(a) to employ its own estimated average number of attaching entities.

In estimating the average number of attaching entities, FCC relied upon its expertise and the information it had developed during the rulemaking that led to the *Recon Order*. This was a perfectly reasonable response considering the lack of essential information FCC had received from the parties. FCC did not simply apply the presumptions of the *Recon Order* to *Teleport* because the *Recon Order* posited the authoritative rules for deciding such disputes. Rather, the rationale behind the *Recon Order* was sufficiently persuasive as to convince FCC, in the exercise of its regulatory expertise, that the presumptions established in that rulemaking were the best estimates of the average number of attachers. While the ordinary use of a rulemaking is to establish authoritative regulations, we see nothing arbitrary or capricious about relying on the information developed in a rulemaking as a persuasive reason for following a particular course in the resolution of an analogous adjudication. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S. Ct. 2164, 2172 (2001) (recognizing that administrative actions can possess "power to persuade, if lacking power to control" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944)). Under the circumstances of this dispute, relying on the

persuasive power of the *Recon Order*'s rationale was a reasonable exercise of FCC's power to estimate the average number of attachers under § 1.1409(a).

Even though FCC did not simply apply the *Recon Order* retroactively, Georgia Power nonetheless argues that using its presumptions to estimate the average number of attachers amounted to the same thing and was effectively retroactive. A statute or administrative regulation does not operate retroactively merely because it applies to prior conduct; rather, a statute or regulation has retroactive effect if it "would impair rights a party possessed when he acted, increase [his] liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S. Ct. 1483, 1505 (1994); *see also Resolution Trust Corp. v. Ford Motor Credit Corp.*, 30 F.3d 1384, 1388 (11th Cir. 1994). Given this standard, FCC's estimate of the average number of attachers based on the rationale of the *Recon Order* was not retroactive. Although Georgia Power had the responsibility under the *Telecom Order* to create its own averages, that burden of proof is not a right that it possessed. Nor did FCC's estimate of the average number of attachers create any liabilities for past conduct. Finally, FCC imposed no new duties upon Georgia Power because both the *Telecom Order* and the *Recon Order* required it to provide the information and methodology upon which its averages were developed. *Compare Telecom Order*, 13 F.C.C.R. at ¶ 78 ("A utility shall, upon

18

request, provide all attaching entities and all entities seeking access the methodology and information by which a utility's presumption was determined.") *with Recon Order*, 16 F.C.C.R. at 12,138, ¶ 67 ("The utility shall make available its data, information and methodology upon which the averages were developed, unless the default averages are used."). Therefore, FCC's reliance on the *Recon Order* to estimate the average number of attaching entities on Georgia Power's poles was not improperly retroactive.

C. *Georgia Power's Additional Evidence of the Average Number of Attachers*

Georgia Power also complains that FCC did not allow it to supplement the record to provide the information that would have substantiated its pole attachment rate. After Teleport filed its reply brief, Georgia Power moved the Cable Services Bureau to allow it to file additional exhibits and information related to its rate calculations. The Cable Services Bureau denied Georgia Power's motion. *See Order Denying Motion: Teleport Communications Atlanta, Inc. v. Ga. Power Co.*, 16 F.C.C.R. 11,831 (2001) (*Order Denying Motion*). In its application for review before the full Commission, Georgia Power argued that, in light of the Bureau's reliance on the *Recon Order*, it should have been permitted to supplement the record with additional information related to the *Recon Order*. FCC rejected this argument, reasoning that Georgia Power did not attempt to submit appropriate additional

19

materials after the Bureau denied its initial motion. *See Final Order* 17 F.C.C.R. at 19,864, ¶ 13. Georgia Power now argues that, in light of the central role the *Recon Order*'s presumptive number of attachers has played in this dispute, it was arbitrary and capricious for FCC not to allow Georgia Power to supplement the record with information germane to the *Recon Order*.

FCC resolves pole attachment disputes according to a three-part pleading cycle. 47 C.F.R. §§ 1.1404, 1.1407. In general, "no other filings and no motions other than for extension of time will be considered unless authorized by the Commission." 47 C.F.R. § 1.1407(a). Commission rules do allow for additional filings, *see* 47 C.F.R. § 1.1409(a) ("The Commission may also request that one or more of the parties make additional filings or provide additional information."), but the rules are permissive, not mandatory. FCC may also, "in its discretion," order an evidentiary hearing, *see* 47 C.F.R. § 1.1411, but again, that rule is permissive, not mandatory.

In light of this well-established procedure, Georgia Power's arguments regarding its supplemental submissions are without merit. First, FCC is entitled to rely upon its standard three-part pleading mechanism for resolving pole attachment disputes. With its initial motion to file supplemental evidence, Georgia Power sought to add an additional round of pleadings to the *Teleport* dispute. FCC determined that there were no new issues raised in Teleport's reply that were relevant to resolving the

dispute. *See Final Order*, 17 F.C.C.R. at 19,867–68, ¶ 22; *see also Teleport*, 16 F.C.C.R. at 20,240, ¶ 6. Georgia Power was given a full and fair opportunity to respond in its first pleading, meaning that it had a complete opportunity to present its case, and there was nothing arbitrary or capricious in the denial of its motion.

Moreover, the supplemental materials Georgia Power sought to file after the close of the three-part pleading cycle were primarily related to Georgia Power's continuing effort to use a replacement cost methodology rather than FCC's historical cost method. Nothing in those materials filled the holes in Georgia Power's original filings in support of its rate, especially Georgia Power's failure to provide the methodology and data underlying its average number of attachers. *See supra* Part II.A. Given that the information in Georgia Power's supplemental materials was largely beside the point, it is not surprising that FCC refused to deviate from its established procedures. Georgia Power could have attempted to supplement the record with information that was actually relevant to properly calculating the attachment rate, but it never attempted to submit appropriate material. As FCC correctly recognized, "[Georgia Power] chose not to file supplemental material in response to the Bureau's [*Order Denying Motion*]." *Final Order*, 17 F.C.C.R. 19,864, ¶ 13.

We see nothing arbitrary or capricious in FCC's decision not to order or authorize Georgia Power to submit additional information regarding the average number of attaching entities. At every stage of this dispute, Georgia Power has attempted to substitute its own preferred methodology for fixing pole attachments rates for that of FCC. None of its submissions—including the supplemental materials the Cable Services Bureau rejected—would have supplied FCC with the information it needed to calculate the pole attachment rate in accordance with FCC's governing regulations. In light of Georgia Power's position, FCC's decision to estimate the average number of attachers in light of the *Recon Order* and pursuant to 47 C.F.R. § 1.1409(a) was wholly reasonable. We therefore reject Georgia Power's argument.

D. *FCC's Definition of "Attaching Entities"*

Next, Georgia Power attacks the manner in which FCC arrived at the average number of attachers. At bottom, Georgia Power's complaint is that the FCC's presumptions include utilities and government agencies as possible "attaching entities" when such a construction is contrary to the language of the Telecommunications Act. By including utilities and government agencies in the group of attaching entities, FCC's presumption increases the total number of attachers, thereby reducing the rent that can be imposed on each individual attaching entity.

The term "attaching entity" in 47 U.S.C. § 224(e) is undefined by the statute, but a "pole attachment" is defined specifically as an attachment by a cable television system or provider of telecommunications services. 47 U.S.C. § 224(a)(4). Georgia Power reasons that the definition of "pole attachment" limits the range of possible "attaching entities" in § 224(e). Georgia Power also notes another subsection distinguishes between entities that obtain attachments to a pole and "other entities," where "other entities" include the owner of the pole, i.e. the utility. 47 U.S.C. § 224(i).

In reviewing administrative agency interpretations of statutes, we must apply the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781–82 (1984). Under *Chevron* step one, the question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S. Ct. at 2781. If so, then both the agency and the court must give effect to the intent of Congress. *Id.* at 842–43, 104 S. Ct. at 2781. If the statute in question is silent or ambiguous, however, *Chevron* step two requires the court to defer to the agency so long as the agency's construction of the statute is permissible. *Id.* at 843, 104 S. Ct. at 2782.

At most, Georgia Power's efforts at statutory interpretation can go only far enough to show that § 224(e) is ambiguous at *Chevron*'s step one. Thus, we must

23

defer to any reasonable agency interpretation of the statute. FCC reasoned in the *Recon Order* that, had Congress meant to limit the term "attaching entity" to only cable and telecommunications providers, it would have used the terms "cable services system" and "telecommunications carrier" in § 224(e) rather than the more general term "entity." *Recon Order*, 16 F.C.C.R. at 12,133–34, ¶ 59. This is a more reasonable interpretation of the statute than Georgia Power's attempt to interpose the definition of "pole attachment" as a definition of "attaching entity" in § 224(e). *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225–26 (11th Cir. 2001) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted)). At *Chevron* step two, the Court must therefore defer to the agency's interpretation. *Accord S. Co. Servs., Inc. v. FCC*, 313 F.3d 574, 580 (D.C. Cir. 2002) (finding § 224(e) ambiguous and concluding "FCC's decision to count utilities among 'attaching entities' is an eminently reasonable interpretation of the statute").

E. *Market Negotiations Prior to FCC's Resolution of the Dispute*

According to Georgia Power, the plain language of the Telecommunications Act requires parties to negotiate pole rents prior to filing a complaint with the

24

Commission. 47 U.S.C. § 224(e)(1) ("The Commission shall . . . prescribe regulations . . . to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges."). FCC's regulations similarly invoke the Commission's rates "[w]hen parties fail to resolve a dispute regarding charges for pole attachments." 47 C.F.R. § 1.1409(e). Georgia Power argues based on these rules that, because there had been no real negotiation between Georgia Power and Teleport, the parties had not yet "failed to resolve the dispute" and FCC intervened prematurely by ruling on the *Teleport* complaint.

Georgia Power's argument fails because its major premise is mistaken. Georgia Power characterizes 47 U.S.C. § 224(e)(1) and the related FCC regulations as permitting FCC to intervene *only* after negotiations between the parties have broken down. In fact, the statutory and administrative rule is not so limited. When negotiations fail the FCC rates will govern, but the statute is not written to limit the jurisdiction of the FCC to cases in which extensive rate negotiations have failed. At the very least, the statute is not so unambiguous that FCC's interpretation of it (as evidenced by its resolving the *Teleport* complaint) is contrary to a clearly expressed Congressional intent. Georgia Power therefore cannot prevail with a *Chevron* step

25

one argument, and under *Chevron* step two, the agency's interpretation is reasonable enough to be entitled to deference.

Even if Georgia Power were correct in claiming that FCC can intervene in a pole attachment dispute only after the parties' negotiations are unable to reach an agreement, Georgia Power's argument that FCC intervened too quickly still fails. FCC concluded that Georgia Power and Teleport's limited discussions had failed to resolve their dispute over Georgia Power's new pole attachment rates, and further negotiations between the parties would be fruitless. Georgia Power unilaterally announced that it was raising its pole attachment rate to a relatively high $53.35. The parties exchanged some correspondence about the rate, and then Teleport filed its complaint with the FCC. The Cable Services Bureau concluded that the parties' positions had "jelled." *Teleport*, 16 F.C.C.R. at 20,241, ¶ 8; *see also Final Order*, 17 F.C.C.R. at 19,867, ¶ 21 ("We think it was reasonable for Teleport to conclude that further efforts at negotiation were fruitless in the absence of Commission intervention."). Georgia Power does not challenge the substantive accuracy of this conclusion; instead, it argues that some additional, formal negotiations were required before FCC could conclude that further negotiations would be futile. When Georgia Power announced its new $53.35 rate, however, it was quite clearly not attempting to open negotiations at that price but was instead attempting to fix a price unilaterally.

26

*Cf. S. Co.*, 313 F.3d at 583 (approving related FCC rules authorizing an attacher to file a complaint when a utility makes a "take it or leave it" demand for pole attachment fees). Georgia Power has not supplied a sufficient reason to doubt FCC's conclusion that it would have been useless for Teleport to do any more than it did to negotiate a better price. FCC therefore did not err by resolving *Teleport* when it did.

F. *Just Compensation Provided by FCC's Rate*

In both the first and the second petition, Georgia Power argues FCC's rate denied it just compensation for the taking mandated by the Telecommunications Act. As Georgia Power concedes, this issue is now controlled by our recent decision in *Alabama Power*. In *Alabama Power*, FCC rejected the price demanded by Alabama Power for a cable company's attachments to its utility poles. Alabama Power petitioned for review of the FCC's order, arguing that the cable rate imposed by FCC did not provide the constitutionally-required just compensation for the taking effected by the Telecommunications Act. *See Ala. Power*, 311 F.3d at 1360–61. Chief among Alabama Power's complaints was FCC's use of historical costs rather than fair market value or replacement cost. *See id.* at 1367.

Alabama Power's argument for some alternative to the cable rate established by FCC was "complicated by one known fact, one unknown fact, and one legal principle." *Id.* at 1368. The known fact is that an attacher must pay for any "make-

ready" costs and all other marginal costs of using the utility's poles. *See id.* The legal principle is that just compensation for a taking is determined by the loss to the person whose property is taken. *Id.* at 1369 (citing *United States v. Causby*, 328 U.S. 256, 261, 66 S. Ct. 1062, 1065–66 (1946); *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 635, 81 S. Ct. 784, 792 (1961)). In the more typical case of rivalrous goods, "the 'value' of the thing taken is congruent with the loss to the owner." *Id.* The part of the utility pole that is taken for mandated pole attachments is, however, practically "nonrivalrous"—use by one entity does not necessarily diminish use by others. *Id.* In most cases, there is enough space on the existing utility pole network to accommodate the attaching entity's needs without forcing the utilities to sacrifice anything. The only possible loss to the utilities is the lost opportunity to rent space at market prices, but the Court found it irrelevant whether the government keeps the property it has taken for itself or instead transfers it to another entity. *Id.*

The crucial unknown fact on which *Alabama Power* turned was whether the utility's poles were at full capacity, at which point the space on which the cable company wanted to attach would become rivalrous. *Id.* at 1370. Alabama Power did not establish that its pole network was crowded, so it could not claim the cable rate provided insufficient compensation. According to the Court,

before a power company can seek compensation above marginal cost, it must show with regard to each pole that (1) the pole is at full capacity and (2) either (a) another buyer of the space is waiting in the wings or (b) the power company is able to put the space to a higher-valued use with its own operations. Without such proof, any implementation of the Cable Rate (which provides for much more than marginal cost) necessarily provides just compensation.

*Id*. at 1370–71.

The instant case does not materially differ from *Alabama Power*. In fact, Georgia Power has even less to complain about than did its sister, Alabama Power. Recall that the 1996 Telecommunications Act mandates two different formulas for calculating pole attachment rates: the cable rate for cable company attachments and the new telecom rate for telecommunications attachments. *Alabama Power* was a challenge to the cable rate, while the rate set by FCC in this case was predicated on the same number of attachers as is presumptively set by the telecom rate. As *Alabama Power* recognized, however, the telecom rate yields a higher pole attachment rate for telecommunications attachments than the cable rate yields for cable attachments. *Id*. at 1371 n.23. If the cable rate provided more than just compensation in *Alabama Power*, then the higher rate set by FCC in this case provides just compensation to Georgia Power. It follows that Georgia Power's claim that FCC has failed to provide just compensation must be rejected in light of this Circuit's precedent.

## III.

Despite Georgia Power's numerous allegations of errors, we conclude FCC did not act arbitrarily or capriciously in disposing of Teleport's pole attachment complaint in the manner it did. This dispute arose at a time when the regulatory regime governing pole attachments was in a state of flux. Unfortunately, Georgia Power exacerbated the situation by attempting to substitute its own preferred regulations for the regime established by FCC. Now that FCC has fully articulated the standards that govern pole attachment disputes, we would not expect to see any similarly difficult pole attachment disputes in the future. As far as this adjudication is concerned, however, FCC exercised its administrative expertise as best it was able, and we find no fault with its conclusions.

DENIED.